**BRUCE CONSTRUCTION CORPORA-TION et al., Appellants,**

v.

**UNITED STATES of America for use of WESTINGHOUSE ELECTRIC SUP-PLY COMPANY, Appellee.**

No. 16374.

United States Court of Appeals
Fifth Circuit.

April 12, 1957.

874

Charles R. Scott, Jacksonville, Fla., H. Reid DeJarnette, Miami, Fla., John S. Cox, Marvin L. Thacker, Jacksonville, Fla., Scott & Cox, of counsel, Jacksonville, Fla., for appellants.

Eugene T. Branch, Atlanta, Ga., Ray W. Richardson, Jacksonville, Fla., Bird & Howell, Atlanta, Ga., Patterson, Freeman, Richardson & Watson, Jacksonville, Fla., of counsel, for appellee.

Before TUTTLE and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The question is whether summary judgment ought to have been granted against a general contractor and its surety [1] in an action under the Miller Act, 40 U.S.C.A. §§ 270a–270d, for materials furnished to or for a subcontractor [2] for construction of a Veterans Hospital.

■ We have long recognized that no matter how enticing, in an era of congested dockets, is a device to dispose of cases without the delay and expense of traditional trials with their sometime cumbersome and time-consuming characteristics, summary judgment was not devised for, must not be used as, a substitute for trial. Its wholesome utility is, in advance of trial, to test, not as formerly on bare contentions found in the legal jargon of pleadings, but on the intrinsic merits, whether there is in actuality a real basis for relief or defense. Consequently, where the proceedings have indicated that a genuine issue existed, we have consistently rejected [3] appealing shortcuts and not the less so even though it was likely that on a trial, the trier would resolve the disputed issues as one of fact in the same manner as when thought to have been one of law alone.

■ But, equally vigorous in giving full range to this mechanism, we have just as consistently rejected any notions that pretense, or apparent formal controversy can thwart application of this rule or hamstring the court in de-

1. The General Contractor comprised Bruce Construction Corporation, Miami Station Incorporated, Jack S. Mintzer, I. L. Mintzer. The surety on the Payment Bond was Federal Insurance Company.

2. This was Flamingo Electrical Contracting Company, Inc.

3. Gray Tool Co. v. Humble Oil & Refining Co., 5 Cir., 186 F.2d 365; Palmer v. Chamberlin, 5 Cir., 191 F.2d 532, 540, 27 A.L.R.2d 416; Chappell v. Goltsman, 5 Cir., 186 F.2d 215, 218; Whitaker v. Coleman, 5 Cir., 115 F.2d 305, 307; Gulf Power Co. v. Local Unions Nos. 676 and 1078, 5 Cir., 229 F.2d 655.

termining whether it is a proper case for it. Consequently, when a movant makes out a convincing showing that genuine issues of fact are lacking, we require[4] that the adversary adequately demonstrate by receivable facts that a real, not formal, controversy exists, and, of course, he does not do that by mere denial or holding back evidence.

And yet, reflecting in spots a picayunishness out of step with the spirit of the Federal Rules, that is just what the General Contractor did and which the District Court found, as do we, inadequate.

It asserts, for example, that an issue of fact was revealed because the complaint alleged that the last material was supplied to the Subcontractor on January 14, 1955, while one affidavit said it was January 15, and two others fixed it at January 17. But this was just such trivia as the Federal Rules were designed to weed out. For the date was important only in fixing the time within which the 90-day written notice must be given, 40 U.S.C.A. § 270b, where services or supplies are furnished to a subcontractor. And, except for a like quibbling, there was really no question about this. By categorical affidavit, an authenticated copy of the letter dated January 24, 1955, from the Supplier to the General Contractor (with indicated copies to the Subcontractor and surety) giving plain notice that the unpaid balance of the Subcontractor's account was $112,997.78 was shown to have been sent Registered-Return Receipt Requested that day and receipted for by a specified representative of the General Contractor on January 26, 1955. Because another somewhat similar letter was sent on May 23, 1955, beyond the 90-day period, and the copy of the one of January 24 was not somehow itself sworn or certified to, Fed.Rules Civ.Proc. rule 56(e), 28 U.

S.C.A. (although the affidavit of the credit manager incorporated and attached it as an exhibit) and these minor discrepancies appeared, it is claimed that a court, with or without a jury, had to hear evidence on this matter even though it was conceded on argument, as it had to be that a notice specifying the balance as $112,997.78 was a statement "with substantial accuracy" for a claim asserted and allowed finally in the sum of $114,770.52, Coffee v. United States, 5 Cir., 157 F.2d 968; Houston Fire & Casualty Insurance Co. v. United States, 5 Cir., 217 F.2d 727.

Equally hypercritical is the struggle to contrive a dispute over the filing of the suit within one year after the date of final settlement between the Government and the contractor, 40 U. S.C.A. § 270b(b). As it was undisputed, we hold above, that the last material was supplied about January 15–17, 1955, the contract obviously was not then closed, and the suit, filed August 26, 1955, while theoretically capable of being too early, could not possibly have been too late. Moreover, no one would have better knowledge of the exact time final settlement was made with the Government, or more ready means for obtaining the conclusive certificate of the Comptroller General, 40 U.S.C.A. 270c, than the General Contractor. It could not, in the good faith the Rules command, FRCP 8(b), 11, 56(g), construct a disputed issue by allegations in its answer that it was "without knowledge as to [those] * * * allegations of * * * said complaint." And when this matter, after a year's pretrial discovery, reached a hearing on the motion for summary judgment in which the Judge, FRCP 56(d), by examination of the papers and "interrogating counsel," would have to determine to what extent genuine issues were lacking, it was for the General

4. Chambers & Co. v. Equitable Life Assurance Society, 5 Cir., 224 F.2d 338, 346; Surkin v. Charteris, 5 Cir., 197 F.2d 77, 79; American Ins. Co. v. Gentile Bros. Co., 5 Cir., 109 F.2d 732; Wilkinson v. Powell, 5 Cir., 149 F.2d 335; and see,

Engl v. Aetna Life Ins. Co., 2 Cir., 139 F.2d 469, 473; Radio City Music Hall Corp. v. United States, 2 Cir., 135 F.2d 715, 718; 6 Moore, Federal Practice (2d ed.) § 56.15[3] p. 2131, 2132, § 56.15[5] p. 2147–2149, § 56.17[31] p. 2222.

Contractor then to demonstrate under oath what it did not attempt to do, because it could not. So the complaint again is that trial was denied of an issue in fact utterly out of the case, and on which no dispute could or did exist and which, of all people, the General Contractor so well knew.

The matter stands no differently when it comes to the accuracy and recoverability of the amount ($114,770.52) sued for and allowed. This was not, as has sometimes been the case, of court and some counsel rushing headlong into time-savers that turn out to be time wasters. Here, starting with a complaint which attached a detailed list showing the date, number and amount of every invoice, charge and credit, discovery machinery was used by the General Contractor as fully as desired. Detailed, sworn, factual answers by the Supplier to interrogatories showed the exact totals of all of the deliveries made and charged to the Subcontractor with credits, and those delivered to the General Contractor for use by the Subcontractor, and credits for payments made by it. These corresponded to the penny to the amount sued for and allowed. Subsequently, upon motion and order under FRCP 34, months before the submission of the motion for summary judgment, the General Contractor sought and the Supplier furnished for unlimited examination and use all purchase orders made to Westinghouse Electric Supply Company for materials used or to be used, all quotations made to the Subcontractor for materials used or to be used, and all invoices for materials furnished to be used or used in this construction project. And, months later, with no suggestion from the General Contractor that it did not have adequate information or time within which to procure it, the Supplier's motion for summary judgment was filed with affidavits of three persons having personal knowledge of the matters, FRCP 56(e), categorically showing the delivery of all of the materials at the times, quantities and prices indicated in the identified invoices. Not until the eve of the hearing,

September 14, 1956, did the General Contractor dispute or deny or claim doubt about knowledge when it filed the affidavit of one of the individual general contractors, Jack S. Mintzer.

From this, it is claimed, disputed issues arose for two reasons: first, while the complaint alleged the supply of "materials for the prosecution of the work * * * to [the Subcontractor] of a price or value of $114,770.52 * *," the affidavits and interrogatories showed without dispute that of this sum, $2,601.16 actually represented the net balance yet due and owing by the General Contractor not Subcontractor, for the materials supplied direct to it. Second, the counter-affidavit of Mintzer *denied* the correctness of the claimed amount and asserted that it was excessive to the extent that the invoice prices charged exceeded the quotation which the Supplier gave the Subcontractor.

 The first ignores both the limited function of the complaint under rules which test relief by the evidence received, Millet v. Godchaux Sugars, Inc., 5 Cir., 241 F.2d 264, FRCP 15(b), and the substantive fact that the General Contractor and its surety are liable under the Miller Act for materials supplied to it as well and, being part and parcel of the main controversy could be asserted within the framework of the same suit, 40 U.S.C.A. § 270b.

 The second fails because on the record made before the District Court, it was not a case of wager by affidavit, one declaiming, one denying. The Supplier, in response to discovery machinery invoked by the General Contractor, had furnished every fact requested and every piece of paper available. This information showed in factual detail the exact materials ordered, delivered, invoiced, billed, charged, and paid, and then, by persons having requisite, personal knowledge of the facts, FRCP 56(e), the affidavits affirmed categorically that the detailed data was correct and the amounts charged, credited and remaining were due and owing.

To start off the counter-affidavit that "Affiant denies that the defendants [this did not include the Subcontractor] or any of them are indebted to the * * * Supply Company in the sum claimed * * *" while creating a formal apparent dispute was not sufficient to create one in substance. Since the papers reflected, what indeed the General Contractor stoutly proclaimed, that the materials had been supplied to the Subcontractor as a result of dealings between it and the Supplier alone and for which the General Contractor, in ignorance of the transaction, was a sort of innocent, statutory by-standing guarantor, the affidavit neither disclosed that the witness (affiant) was one having personal knowledge, FRCP 56(e), nor, more important, what that knowledge (i. e., facts) was. With detailed facts showing *what* was due and *why* it was due, and showing not merely a prima facie case which would be inadequate, but a case compelling judgment unless facts were brought forward showing partial or complete invalidity, a simple denial is a mere conclusion and that is insufficient, Lawson v. American Motorists Insurance Corporation, 5 Cir., 217 F.2d 724, 727; Schreffler v. Bowles, 10 Cir., 153 F.2d 1, 3, certiorari denied 328 U.S. 870, 66 S.Ct. 1366, 90 L.Ed. 1640; and cases note 4, supra.

For the same reasons the denials and assertions in the counter-affidavit concerning quoted prices were formal, not real, were allegations of one naturally unhappy about answering for the default of another, but indicating no actual, factual basis for the hope that the amount might turn out to be less. The Supplier by answers to interrogatories[5] and by its affidavits[6] set forth the facts concerning the suggestion that a fixed maximum price had been quoted. It should be remembered that the assertion of a general maximum quotation had been injected obliquely as a defense to the stated account of the Supplier. It was, hence, no part of its case for recovery, but these papers established that no general quotation had been made and that all prices as charged, billed and shown in the supporting data were in accordance with the prices submitted and quoted. In the face of this, if the General Contractor was asserting that an issue existed because of the claimed general quotation, it did not establish this for the counter-affidavit was, in reality, but a mere denial.[7]

5. The answers stated that the Subcontractor "was never quoted a figure for all the materials to be used"; that the Subcontractor was told that the major portions, comprising about 57 items and about 70% to 80% of the materials to be supplied "would run about $158,000 to $163,000"; and that the Subcontractor was "given the book price and told that Westinghouse would hold that price for forty-five (45) days," but that "No other type of commitment was made * * * and there was never any take-off and quotation on the entire job" and "No sum was quoted * * * for all of the materials to be used * * *."

6. The affidavit of the salesman handling this transaction with the Subcontractor stated that " * * * he quoted * * * a price on the major items and some of the minor items which would be needed * * *," but that " * * * * he did not quote any price for all the electrical supplies and equipment required for said work and was never awarded any contract or given any order to supply all of such materials. All of the supplies and materials which he sold to [Subcontractor] were sold on a separate order * * *" and that the materials he sold and supplied to the Subcontractor " * * * were charged for in accordance with the prices which he quoted on said materials in instances where such quotations were asked for or provided."

7. The counter-affidavit, reciting that the Subcontractor was now in bankruptcy and the account due the Supplier had been the subject matter of dispute and many conferences in some of which representatives of the Supplier acknowledged that there were many adjustments to be made in the account, and which thereby demonstrated the need for a complete audit, then set forth " * * * by way of illustration * * * incidents in which overcharges were made * * *." This was followed by the statement "Westinghouse quoted the following items at the following prices" and a list

Since under the motion and order to produce, the Supplier, with no question then or ever raised about its compliance, delivered "All quotations, or copies thereof, made by [the Supplier] to [Subcontractor] for materials to be used, or used" the complete silence in responding papers and the counter-affidavit specifying any written quotations made it plain, as the District Court, FRCP 56(d), undertook to ferret out the genuine from the non-genuine issues of fact, that if there were quotations of the kind "*averred*," they were bound to have been oral.

At that point, it was not open to the General Contractor merely to *aver*, which is the language of a pleading, not the normal statement of fact in an affidavit. The affidavit had first to be made by someone shown to be competent to have testified as a witness in court to the facts of any such negotiations. And, second, whether couched in terms of "aver" or "state," it had to recite those facts from which it would be possible for the court to determine whether quotations were, in fact, expressly or impliedly made, and if so, their scope and legal significance.

But this affidavit neither satisfied these requirements nor attempted to set forth reasons why under FRCP 56(f)

affidavits or facts were then unavailable, Whitaker v. Coleman, 5 Cir., 115 F.2d 305. And argument revealed that this was neither inadvertence nor a draftsman's error. On the contrary, with candor that bespeaks the professional responsibility of its able advocates, it is plain that neither they nor the clients for whom they act were willing lightly to bandy about an oath, and what they said, what they meant to say, and all they were saying by this affidavit was that they did not *know* what the facts were, and that consequently, a court should determine them after trial for it is not right to be cast in judgment until the facts are court-proved.

This was either unsubstantiated doubt as to the accuracy of the sworn papers of the movant, Thomas v. Mutual Benefit Health & Accident Association, 2 Cir., 220 F.2d 17; Radio City Music Hall Corp. v. United States, supra, the optimistic hope that something might turn up, Moore, Federal Practice § 56.15[3] p. 2129; Port of Palm Beach District v. Goethals, 5 Cir., 104 F.2d 706, or a claim that it is the adversary, not the court, who must be satisfied and determine whether a genuine issue of fact exists. All are untenable.

Affirmed.

of ten identified items with prices charged, and then the statement "Westinghouse billed these items at the following prices, as will appear by invoices numbered as shown" with a list identified by invoice number of these same materials showing a different and higher price. Thereafter it states that as the answered interrogatories (note 5, supra) reflect "the major portions of the job would run about $158,000 to $163,000 whereas the amount claimed * * * was $207,324.45 and [the] deponent *avers* that

Westinghouse * * * did quote a price not to exceed $163,000 for material to be furnished upon said job" and "Deponent denied that all of the supplies * * * sold * * * to [Subcontractor] were sold under a separate order or separate orders * * *" and then follows a categorical denial of the statement in the salesman's affidavit, note 6, supra, that all materials were charged for in accordance with prices as asked for, quoted and provided. (Emphasis supplied.)