343 F.2d 887
 LOUISVILLE & NASHVILLE RAILROAD COMPANY and Atlantic Coast
Line Railroad Company, Lessees of the Georgia
Railroad and Banking Company, Operating
under the trade name of
Georgia Railroad, Appellant,
v.
KNOX HOMES CORPORATION, Appellee.
 No. 21507.
 United States Court of Appeals Fifth Circuit.
 April 1, 1965.
 
 J. Walker Harper, Augusta, Ga., for appellant. Fulcher, Fulcher, Hagler & Harper, Augusta, Ga., of counsel.
 John Bell Towill, Augusta, Ga., for appellee. Hull, Willingham, Towill & Norman, Augusta, Ga., Robert E. Knox, Thomson, Ga., of counsel.
 Before BROWN and BELL, Circuit Judges, and SPEARS, District Judge.
 JOHN R. BROWN, Circuit Judge.
 
 
 1
 Immediately involved here is the question whether the District Court properly directed a verdict for the Shipper[1] and against the Carrier[2] in the Carrier's claim for undercharges. The underlying issue is whether, under the applicable tariff, the Shipper was entitled to substitute carloads of Georgia-South Carolina lumber for the West Coast shipments of fir admittedly entitled to Transit privileges. Upon the completion of the Carrier's evidence before a jury whose presence seemed on all hands to have been a superfluous affectation, the Shipper moved for a directed verdict, and the Carrier followed suit, each party proceeding on the assumption that in the final analysis it was a question of law for the Court. The Trial Court granted the motion of the Shipper on two grounds. The first was on the construction of the Tariff. It seems to have run on a double track, either one of which was sufficient: (a) the tariff justified the Shipper's practice, or (b) if it did not, then the tariff was so ambiguous that the Shipper was entitled to the construction most favorable to it. The second ground was that the Carrier by identified Carrier records of waybills, freight bills, and the like had not sufficiently established the correct weight of the shipments involved to make out a prima facie case. We reverse the judgment in part and in effect render that portion for the Carrier. But as to the more troublesome question of tariff construction, we vacate the judgment and return that aspect to the District Court for initial determination by the Interstate Commerce Commission under the doctrine of primary jurisdiction.
 
 
 2
 The Transit Point is the Shipper's plant at Thomson, Georgia, situated on the Georgia Railroad. The initial inbound transit shipments came from the West Coast presumably under Transit Rates and billing for ultimate delivery to the Miami, Florida area. There is no question that the West Coast shipments fully qualified for the Transit Privileges if the lumber (or its products) after being held at the Transit Point had moved on to ultimate Destination Points. The problem arises, however, because the West Coast lumber did not move on. What the Shipper did was to substitute 119 cars of Georgia-South Carolina lumber. Of these shipments 107 cars moved via rail to Thomson, Georgia, from various points of origin,[3] and the remaining 12 cars moved to Thomson from the mills[4] by motor truck.
 
 
 3
 There is agreement that substitution is permitted. The dispute revolves around the tariff restrictions on substitution, what it is that makes a shipment eligible either as a substitute or to be substituted for, and the tariff consequences, rate adjustments, etc. to make a shipment partially eligible for Transit Privileges.[5]
 
 
 4
 Although, as a sort of reflex to the proposition that merely because Judges can understand the operation of a device does not necessarily establish lack of invention, Hughes Tool Co. v. Varel Mfg. Co., 5 Cir., 1964, 336 F.2d 61, 63, n. 8, citing, Florence-Mayo Nuway Co. v. Hardy, 4 Cir., 1948, 168 F.2d 778, 781, we run a considerable risk that simplicity may sacrifice accuracy, we think it aids such understanding as is within our competence to consider the tariff broadly in a general way apart from each of the particular, and frequently confusing, parts. As thus sublimated, the tariff[6] provides substantially the following. Transit privileges[7] which consist of the forwarding to a specified Transit Point of carload shipments of lumber and forest products (including veneer, plywood and built-up wood) for storage, dressing, resawing, drying, sorting, inspection or conversion into specified wood products, and the forwarding of carload shipments to a subsequent and farther destination will be permitted[8] at the specified Transit Points[9] for such lumber originating at the specified Origin Territory Points[10] and reshipped to specified Destination Territory Points.[11] On shipments from Origin Points not within specified Origin Territory,[12] Transit may be granted on the basis of the local rate to the nearest Point within the specified Origin Territory plus the rate from such Transit Point to Destination.[13] Although a movement into, and a subsequent movement out of, the Transit Point is required to permit these special rates,[14] it is not necessary to preserve the identity of the lumber and substitution is permitted under the tariff rules.[15] The tariff rules restrict substitution to lumber entitled to transit privileges.[16]
 
 
 5
 The Carrier's case is simple, even though the simplicity is beguiling. Almost as though it were operated by automatic block signals to open and close specific tariff subdivisions, the contention runs this way. Each of the shipments began at a place, such as Four Holes, South Carolina,[17] which was not in Origin Territory.[18] Consequently, such shipment was 'not entitled to Transit privileges.'[19] That being so, the carload of lumber could not be substituted for a carload of West Coast lumber previously received by the Shipper at the Transit Point (Thomson, Georgia). However, the shipment is not perpetually banished beyond the pale of Transit Privilege eligibility. It may acquire at least limited eligibility if-- but only if-- an additional rate is paid as a combination of the local rate from the point of shipment to the nearest place on the route which is within the specified Origin Territory,[20] plus the rate authorized 'from such transit origin' to destination.[21] Indeed, the suit was for this difference between the through-transit rate as actually paid by the Shipper and the higher combination rate for the two short hauls required under Item 1(b).[22]
 
 
 6
 But we do not think it is that simple. And, contrary to the importunities of the Shipper, 'we must resist the temptation to take the ambiguity route as an easy and quicker way out'[23] -- and for the Shipper the cheaper way out.[24]
 
 
 7
 Especially is this true when the claim of ambiguity rests essentially on the dubious proposition that from the strange terminology used, the traditional, highly sectionalized structure of the tariff, the result, resembling a mixture of a section of the Internal Revenue Code and a patent claim, Thermo King Corp. v. White's Trucking Service, Inc., 5 Cir., 1961, 292 F.2d 668, 675 n. 9, is simply impossible to understand. It rests on the doubtful basis that that which is not crystal clear to the judicial mind must perforce be ambiguous. This claims too much for the law, and certainly for Judges as its votaries. It ignores, too, the law's traditional approach which requires, both for the ambiguous and the unambiguous writing, that one seeking to ascertain the meaning must place himself as near as possible in the position of the parties.[25] And the record in our case is way too sketchy both in testimony as to railroad practices and as to the provisions of the tariffs for us-- as nonrailroading Judges-- to divine with safety what was really meant. We must steel ourselves against easy interpretations which make sense. For whether one particular interpretation 'makes sense is beside the point.' Rather, it 'all depends on what kind of sense is being made-- abstract, contractual interpretation sense, or transportation-railroading sense,' Strickland Transp. Co. v. United States, 5 Cir., 1964, 334 F.2d 172, 178.
 
 
 8
 A brief consideration of the specific terminology of these tariff provisions will bear out these difficulties. Thus, the Carrier's interpretation necessarily reads Item 1(a)[26] into Item 35-C(c)[27] to determine what lumber is entitled to Transit Privileges. And yet Item 35-C(a) is expressly subject to Items 5, 30, and 90. Item 5 (note 7, supra) is the general definition of the term 'Transit Privileges' as referred to in Item 35-C(c). Yet it contains no limitation of the kind set forth in Item 1(a). On the contrary, it is Item 1 which incorporates Item 5, not Item 5 which incorporates Item 1. Unless Item 1(a) is read into both Item 35-C(c) and Item 5, there is no basis for applying Item 1(b) as the Carrier contends. On the other hand, that is putting a high premium on literalness.
 
 
 9
 At the same time a pretty good argument can be marshalled for reading Item 5 alone. The important thing is the forwarding of a carload of lumber to a Transit Point for storage, processing, or the like, and the forwarding of the carload (or its vicarious substitute) to a subsequent and farther destination. It is the planned movement in, the momentary stay at, and the movement out of the Transit Point which justifies these more favorable transportation privileges. This approach makes it difficult to accept the proposition as conceded by the Carrier (see notes 14 and 22, supra) that had the lumber been discharged and used in Thomson, the lower rate as originally billed (and paid) would be applicable. Particularly is this so since the question at issue here is transportation costs into Thomson, not the absence of transportation charges for the movement out of Thomson onto Miami.
 
 
 10
 Other factors are pertinent. One certainly worthy of at least some preliminary inquiry is the significance, if any, of the addition of subparagraph (c) in Item 35-C (note 16, supra) in contrast to the more simple provision in the original tariff (see note 15, supra). This is not just the ordinary legal question of the extent to which amendments can, or should, be interpreted in the light of the prior text. The more serious questions from a transportation policy standpoint involve the extent to which the amended provision is either customarily found in Transit Tariffs or is required by reason of some dominating policy consideration reflecting practices, specific rulings, or decisions of the regulatory agency, the ICC. We are left completely in the dark as to these and much more.[28]
 
 
 11
 Obviously some of these alternative constructions are more plausible than others. Indeed, it is likely that there are even others, many perhaps even more plausible, which we have not even mentioned. And were the consequences left to these adversaries alone, we could pick a path through this tariffese. But the stakes are, or at least may be, much higher.
 
 
 12
 There is, first, a desirability of uniformity which runs through carrier tariff law. Second, and perhaps more important here, the Commission as well as the Courts recognize that Transit Tariff privileges are subject to much abuse and unless carefully policed may be the very instrument of forbidden discrimination, undue preference as between shippers, points, commodities, and the like.[29]
 
 
 13
 Lurking in these words carrying their own transportation overtones are basic perils to a sound transportation policy. Lest these be overlooked or submerged, we think the Commission should first interpret and apply this tariff to the situation posed by this record.
 
 
 14
 We recognize, of course, that ordinarily tariff construction, like the interpretation of any other writing, is a typical judicial function for the Judge even though the divination of the script be a difficult one. Great Northern Railway Co. v. Merchants' Elevator Co., 1922, 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943; W. P. Brown & Sons Lumber Co. v. Louisville & N. Railroad Co., 1937, 299 U.S. 393, 57 S.Ct. 265, 81 L.Ed. 301. Likewise, primary jurisdiction will most frequently be employed where application of tariff provisions turns on factual evaluation of typically transportation matters such as commodity classifications. United States v. Western Pacific R. Co., 1956, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126. But that decision reiterated the broad scope which Far East Conference v. United States, 1952, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576, infused into the doctrine.
 
 
 15
 ' Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.' 352 U.S. at 64-65, 77 S.Ct. at 165, citing, 342 U.S. at 574, 575, 72 S.Ct. 492.
 
 
 16
 And manifesting no purpose to except from its reach the 'pure' question of tariff construction, the Court on that same date remanded United States v. Chesapeake & Ohio Ry. Co., 1956, 352 U.S. 77, 77 S.Ct 172, 1 L.Ed.2d 140, for consideration of the primary jurisdiction question by the Court of Appeals.[30]
 
 
 17
 Even more significant was the action in Southwestern Sugar & Molasses Co., Inc. v. River Terminals Corp., 1959, 360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334, which approved the earlier action of this Court in sending to the ICC the question of interpretation and legal validity of tariff provisions which purported to exculpate a common carrier tug from liability for loss or damage to shipperowned barges and cargo aboard.[31] The dispute calling for transportation evaluation was not about evidentiary 'facts' in the occurrence giving rise to the claim or the status of the craft as carrier or shipper-owned. Rather, it was whether that were transportation policies reflected by tariff and statutory provisions which would make inapplicable the sweeping denunciation of exclupatory towage contracts in Bisso v. Inland Waterways Corp., 1955, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911.[32]
 
 
 18
 Although primary jurisdiction may properly, and should here, be invoked, Southwestern Sugar & Molasses also teaches quite positively that the judiciary is to complete its own homework. Matters not requiring agency evaluation are therefore to be determined by the Court. Conceivably the non-referred aspects might have to await receipt of the administrative determination, but here, as there, they are quite distinct and no delay is necessary or desirable. Consequently, we must make a judicial examination and doing so we reject the other basis on which the District Court granted the Shipper's motion for directed verdict.
 
 
 19
 The District Court held that the Carrier failed to make out a case on the weight of the shipments, and since the additional charges were geared to weights, there was a failure to establish a prima facie case even assuming the Carrier's construction of the tariff was correct.
 
 
 20
 In addition to the verified complaint which included five pages of incorporated exhibits listing in detail all pertinent data covering each of the 119 carloads,[33] the Carrier offered in evidence, without objection as to authentication,[34] file copies of the Freight Waybills kept by the Carriers in the regular course of business covering the movement of (a) the cars from point of origin into Thomson, Georgia,[35] (b) the outward movement from Thomson, Georgia, to the destination points in the Miami, Florida, area,[36] and (c) the corrected billing for the undercharges sued for.
 
 
 21
 These documents, having been properly authenticated and objections to authenticity having been categorically waived, were obviously admissible without limitation of use under the Business Records Act, 28 U.S.C.A. 1732. They were not only admissible, but they were enough to carry the day. And the Shipper's effort, whether belatedly or not, to negative a concession on correctness of weight did not affect either the admissibility or the judicial weight to be accorded to them. As there is no question that the record bore out that these papers were kept in the respective Carrier's regular course of business and used by them as the basis for further commercial action in relation to the movement of the shipments, the billing and payment of freight therefor, there is no merit to the objection now urged by the Shipper in its brief that none of the Carrier witnesses identifying the papers knew who weighed the shipments. Indeed, it is the purpose of the Business Records Act to dispense with the necessity of proving each and every entry by the person or persons actually making them. The probative reliability of these papers as proof of the matters reflected therein was established by the system under which they are made. It is the business record in the form[37] regularly kept by the particular business and reliance thereon that gives the trustworthiness and hence legal admissibility to such records. Missouri Pacific R.R. Co. v. Austin, 5 Cir., 1961, 292 F.2d 415.
 
 
 22
 Moreover, these records were such that the Shipper was not free to even impugn their accuracy. They were not only admissible, they were binding on this particular Shipper for these shipments. This is because the Shipper had actually paid the charges as originally billed covering the movement from points of origin to Thomson, Georgia. In so doing, the Shipper placed its own imprimatur of accuracy on these very same weights. There was neither suggestion nor proof that having made payment based upon these weights in the regular course of its affairs, the Shipper had been misled or acted inadvertently or erroneously. Indeed, in view of the statute of limitations, 49 U.S.C.A. 16(3)(c), time had effectively cut off the Shipper's right of contest.
 
 
 23
 Under the peculiar circumstances of this case, these business records were admissible and merely proved again what the Shipper by its conduct had already demonstrated beyond question-- that the weights were those shown. The instructed verdict on this score should therefor have gone for the Carrier, not the Shipper, and the simple general denial in the answer cannot make this 'paper' issue into a real one. Cf. Bruce Construction Corp. v. United States for the use of Westinghouse Elec. Supply Co., 5 Cir., 1957, 242 F.2d 873, 878; Carss v. Outboard Marine Corp., 5 Cir., 1958, 252 F.2d 690, 693.
 
 
 24
 The result is that we reverse and render so much of the judgment as held the proof on weights inadequate. On this aspect, the District Court shall enter an appropriate order. The balance of the judgment as to the construction and application of the tariff is vacated with directions to the Trial Court to hold the cause in abeyance while the parties seek the views of the ICC in any form of proceeding which that body may deem appropriate[38] and for further proceedings consistent with this opinion.
 
 
 25
 Reversed and remanded in part; vacated and remanded with directions in part.
 
 
 
 [1]
 Knox Homes Corporation
 
 
 [2]
 Louisville & Nashville Railroad Company and Atlantic Coast Line Railroad Company, Lessees of The Georgia Railroad and Banking Company, Operating under the trade name of Georgia Railroad
 
 
 [3]
 Since the location of the Origin Point and the identity of the initiating Carrier is relevant to the problem of Origin Territory, we set out each:
 
 
 [4]
 This lumber, subsequently loaded outbound into 12 railroad cars at Thomson, was purchased by Shipper from from which place it was trucked to the railroad siding at Thompson
 
 
 [5]
 This is the specific subject matter of the Carrier's claim against the Shipper here. Its undercharges are based upon a combination of (a) local rates from Point of Origin to an authorized specified Point within the Origin Territory, and (b) the specified rate from such place to the Transit Point
 
 
 [6]
 Tariff No. 1324-G (ICC No. A-285) Lumber Transit Tariff, With Supplements
 
 
 [7]
 'Section 1
 Transit Rules
 Item 5 Definition of the term 'Transit Privileges' 'Transit Privileges' provided in this tariff, * * * are defined as the forwarding to transit point of carload shipments of lumber and forest products as defined in Item 10, also Veneer, Plywood and Built-up wood, for shortage, dressing, resawing, drying, sorting, * * * or inspection; also conversion into (specified wood items) and the forwarding of carload shipments to a subsequent and farther destination.' As amended by Item 5-B sup. No. 14.
 
 
 [8]
 'General application
 'Item 1
 '(a) Transit privileges as defined in Item 5 (note 7, supra) will be permitted at transit points named in Section 2 (see note 9, infra) on lumber and forest products defined in Item 10 originating at points listed in Section 2 under 'Origin Territory' (note 10, infra) and reshipped to points listed in Section 2 under 'Destination Territory' (see note 11, infra) over routes via which through rates are in effect from point of origin to final destination via the transit point. * * *
 '(b) On shipments from origins from which transit is not authorized herein, transit may be granted on basis of the rate to a transit origin, plus rate authorized herein from such transit origin to destination.
 '(c) On shipments to destinations to which transit is not authorized herein, transit may be granted on basis of the rate authorized herein from transit origin to a transit destination, plus rate from such transit destination to final destination in effect on date of shipment from transit point.'
 
 
 [9]
 Section 2 of the tariff lists as 'transit points Crawfordville, Ga. and Thomson, Ga.' In Supplement No. 14, the Transit Point is listed as 'Thomson, Ga.'
 
 
 [10]
 Section 2 of the tariff as to Crawfordville and Thomson, Ga. (see note 9, supra) is made up of three columns as follows:
 Items 705 through 795 set forth in the respective columns the Origin Territory, the Destinations and pertinent tariff identification. Supplement No. 14 adds item 796.
 None of the Origin Points for these shipments of Georgia-South Carolina lumber (see note 3, supra) is listed in the column 'Origin Territory'. Without questioning the georgraphy of it, the Shipper asserts that possibly under Item 755 through 790, reading 'Stations on the: Georgia R.R.,' the tariff would permit Thomson, Ga., the Transit Point, to serve simultaneously as the Origin Point.
 
 
 [11]
 These are listed in the column headed 'Destination Territory' in Section 2 of the tariff, see note 10, supra
 
 
 [12]
 See note 10, supra
 
 
 [13]
 See Item 1 general application, note 8, supra, and particularly 1(b):
 '(b) On shipments from origins from which transit is not authorized herein, transit may be granted on basis of the rate to a transit origin, plus rate authorized herein from such transit origin to destination.'
 
 
 [14]
 Whether it would properly be classed as a transit-rate-privilege-problem is doubtful, but the Carrier concedes, see note 22, infra, that the charges paid would be correct had the lumber been consumed by the Shipper at Thomson, Georgia
 
 
 [15]
 See 1, Transit Rules, Item 35:
 'Item 35. Preservation of Identity-- Substitution.
 'Subject to the provisions of Items 5, 30, and 90 herein, the preservation of identity in handling lumber or other forest products into plants or mills is not required and substitution is permissible under these rules, except, that mahogany lumber or Philippine woods, (here is listed certain Philippine native woods) may not be substituted for other specie of lumber.'
 Presumably this is superseded by Item 35(c) in Supplement No. 14, note 16, infra.
 
 
 [16]
 Supplement No. 14, Item 35-C:
 'Item 35-C. Preservation of Identity-- Substitution.
 '(a) Applicable on all traffic except as otherwise provided in Paragraph (b). Subject to the provisions of Items 5, 30, and 90 of tariff, the preservation of identity in handling lumber or other forest products into plants or mills is not required and substitution is permissible under these rules, except, that mahogany lumber or Philippine woods (here listed) may not be substituted for other specie of lumber.
 '(b) (not here pertinent)
 '(c) There shall be no substitution of lumber or other forest products not entitled to transit privileges for lumber or other forest products entitled to such privileges.'
 
 
 [17]
 See notes 3 and 4, supra
 
 
 [18]
 See notes 8 (Item 1(a)) and 10, supra
 
 
 [19]
 See Item 35-C, note 16, supra
 
 
 [20]
 See note 10, supra
 
 
 [21]
 See Item 1(b), notes 8 and 13, supra
 
 
 [22]
 For example, for the first listed shipment from Four Holes, South Carolina, the rate charged and paid was 21cents totaling $132.30 for the carload. As the Carrier's Brief (page 21) explains it: 'This rate was established by the Atlantic Coast Line and would be correct if the lumber were not substituted, but used by the (Shipper). Since this shipment did not qualify to be substituted for lumber coming from the West Coast, the haul from Four Holes, South Carolina to Thomson has (to be) broken down into a haul from Four Holes * * * to Augusta (the nearest point within specified Origin Territory, note 10, supra) at the rate of 18 cents and from Augusta to Thomson at the rate of 13 cents, or a total of 31 cents, making the freight charges $191.30. The difference between what was paid and what should have been paid is $63.00.' The suit as to that car was for this precise amount
 These computations are supported by specific tariff references and are unchallenged by the Shipper.
 
 
 [23]
 Strickland Transp. Co. v. United States, 5 Cir., 1964, 334 F.2d 172, 177
 
 
 [24]
 In a climax of mixed figuratives, Judge Hutcheson expressed it for us, 'In short, in a situation of that kind, the shipper who has to pay the freight may call the tune.' Atlantic Coast Line R. Co. v. Atlantic Bridge Co., 5 Cir., 1932, 57 F.2d 654, 655-656
 
 
 [25]
 See Travelers Indem. Co. v. Holman, 5 Cir., 1964, 330 F.2d 142, 149, n. 15
 
 
 [26]
 Note 8, supra
 
 
 [27]
 Note 16, supra
 
 
 [28]
 Two circumstances with apparently conflicting implications are suggested in this record. The first, favorable to the Shipper's theory-- not as an estoppel but rather a practical construction indicating the intended meaning-- is the fact that it was the Carrier who billed these shipments for the charges as paid by the Shipper. This practice was apparently purposefully, not inadvertently, done with full knowledge of the Supervisor of the Southern Weighing and Inspection Bureau, an agency of the Carrier expressly charged with the important task of policing this transit arrangement. (See Items 80, 85 of tariff) The second, perhaps favorable to the Carrier but only vaguely hinted at, is the earlier filing in the Court below of some kind of formal legal complaint by the Government against the Carrier for penalties accruing by reason of the erroneous billing (and collection) of these, or similar, charges. Defending that proceeding, the Carrier's theory apparently was the one the Shipper urges here
 
 
 [29]
 Central R. of New Jersey v. United States, 1921, 257 U.S. 247, 42 S.Ct. 80, 66 L.Ed. 217:
 'Creosoting in transit, like other transit privileges, rests upon the fiction that the incoming and the outgoing transportation services, which are in fact distinct, constitute a continuous shipment of the identical article from point of origin to final destination. The practice has its origin partly in local deeds, partly in the competition of carriers for business. The practice is sometimes beneficial in its result; but it is open to grave abuses. / 3/ To police it adequately is difficult and expensive. Unless adequately policed, it is an avenue to illegal rebates and seriously depletes the carriers' revenues. Railroad managers differ widely as to the policy of granting such privileges. * * *' 257 U.S. at 257, 42 S.Ct. at 82. The Court's footnote 3 reads: '3. See Re Alleged Unlawful Rates & Practices, 7 Inters.Com.Rep. 240; Re Substitution of Tonnage at Transit Points, 18 Inters.Com.Rep. 280; Transit Case 24 Inters.Com.Rep. 340.'
 The Court's opinion in Board of Trade of Kansas City v. United States, 1942, 314 U.S. 534, 62 S.Ct. 366, 86 L.Ed. 432, vividly illustrates why it is much too doctrinaire to think that the problem is a simple one of the construction of a writing. After all, this is a part of the 'process of rate making' and this 'is essentially empiric.' The 'problem is enmeshed in difficult judgments of economic and transportation policy.' It 'is not for' courts 'to tinker with so sensitive an organism' as the transit 'rate structure only a minor phase of which is caught in the record before us.' 314 U.S. at 546-548, 62 S.Ct. at 373.
 
 
 [30]
 The specific issue was whether military cargo moving to a seaboard port for export should bear the domestic rate rather than the export rate where the ocean oncarriage was frustrated by the capture of foreign destination ports. On remand the Court of Appeals, applying Western Pacific ordered a reference to the Commission. 4 Cir., 1957, 242 F.2d 732. After the ICC decision, the District Court entered judgment substantially in accord with it, an action the Court of Appeals then held was too hasty pending direct judicial review of the ICC order. 4 Cir., 1960, 281 F.2d 698. The case then died or wore out and leaves no further Shepard headstones. The Clerk's office informally advises that the retained appeal was shortly dismissed on stipulation
 
 
 [31]
 On remand to this Court, we held that on the merits there was no evidence to sustain the District Court's finding of negligent towage. Thus reference to the ICC, approved by the Supreme Court, was never required. River Terminals Corp. v. Southwestern Sugar & Molasses Co., 5 Cir., 1960, 274 F.2d 36. Our earlier opinion prescribing primary jurisdiction reference to the ICC was reported at 5 Cir., 1958, 253 F.2d 922
 
 
 [32]
 The Bisso holding was subsequently reiterated in Dixilyn Drilling Corp. v. Crescent Towing & Salvage Co., 1963, 372 U.S. 697, 83 S.Ct. 967, 10 L.Ed.2d 78; see on remand to this Court, 1963, 324 F.2d 272, opinion withdrawn and rehearing granted, 1964, 329 F.2d 754
 
 
 [33]
 In tabular form the verified exhibits reflected as to each carload the point of origin, date, car number, freight bill number and date, weight, charges paid inbound, reshipment consignee, date of reshipment, the proper combination of local rates and the balance due; these combinations rates were likewise detailed
 
 
 [34]
 At the time of proffer and receipt into evidence, the Shipper's counsel categorically stated, 'No objection' to admissibility. Consistent with its motion (apparently never presented to the Trial Court or this Court) for correction of the record and the earlier answers to the Carrier's formal requests for admissions, we have treated it as though the waiver of objection made clear that the Shipper was not conceding the accuracy of weights reflected on the exhibits
 
 
 [35]
 On a regular railroad form with identified spaces, each waybill showed the car number, date of shipment, destination to Thomson, Georgia, point of shipment, routing, consignee, place of weighing, the gross weight, tare, dunnage allowance, net weight, commodity code number, number and description of the cargo, and the extensions for the specified rate applied to the weight for the freight payable
 
 
 [36]
 These were waybills issued by the Georgia Railroad containing like information plus, as required by the tariff, detailed reference to the inbound shipment from the West Coast by car number, point of origin, routing, weight, and rate
 
 
 [37]
 See, e.g., the recent opinion of the Supreme Court of Nebraska, Transport Indemnity Co. v. Seib, 1965, 178 Neb. 253, 132 N.W.2d 871 (February 5, 1965) in which under the Nebraska Business Records Statute (25-12109 R.R.S. 1943), substantially comparable to the Federal Act, the Court overruled strong objections to the admissibility of data computer print-outs produced from data stored on and retrieved from computer magnetic tapes. As the opinion reveals, the testimony demonstrated in detail the method and system employed, the internal checks and proofs, the reliable acceptance of its output and the other circumstances satisfying the law's requirement that trustworthiness be demonstrated. Brown, Electronic Brains and the Legal Mind: Computing the Data Computer's Collision with Law, 71 Yale L.J. 239, especially at 249, citing, Missouri Pacific R.R. Co. v. Austin, 5 Cir., 1961, 292 F.2d 415; Sunset Motor Lines, Inc. v. Lu-Tex Packing Co., 5 Cir., 1958, 256 F.2d 495; American Colloid Co. v. The Akron, Cantone Youngstown R. Co. (No. 33830), 1963, 321 I.C.C. 91, 93 (and see Examiner's Report); Glass Bottles, Muskogee, Okla. to Chicago Group (Docket No. M-18084), 1964, 323 I.C.C. 258, 260-61; Aggregate Weight Provisions on Paper, Mass. to N.Y., N.J., Div. 2, 1964, 323 I.C.C. 525; Miller, Legal Questions Relating to the New Aids Used in Preparation of Traffic and Cost Evidence, 31 I.C.C.Prac.J. 275 (1963); Freed, Evidence and Problems of Proof in a Computerized Society, 1963 M.U.L.L. 171, in 16 Am.Jur. Proof of Facts, Computer Evidence
 
 
 [38]
 By the August 30, 1964 amendment to the Judicial Code, 28 U.S.C.A. 1336, judicial review of the ICC's order will be in the Court below as the Court of reference