Bailey T. DeBARDELEBEN and Richard Egan, surviving Trustees of DeBardeleben Employee's Retirement Plan, Plaintiffs-Appellants,

v.

Marcellus M. CUMMINGS, Defendant-Appellee.

No. 71–1812

Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

Jan. 3, 1972.

* Rule 18, 5 Cir.; See Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York, et al., 5 Cir., 1970, 431 F.2d 409.

Irvin J. Langford, George W. Finkbohner, Jr., Mobile, Ala., J. B. Blackburn, Bay Minette, Ala., Howell, Johnston, Langford & Finkbohner, Mobile, Ala., for plaintiffs-appellants.

Paul W. Brock, G. Hamp Uzzelle, III, Mobile, Ala., for defendant-appellee; Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, Ala., of counsel.

Before JOHN R. BROWN, Chief Judge, INGRAHAM and RONEY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The battleground for this appeal is the rocky terrain of Subchapter D of the Internal Revenue Code, 26 U.S.C.A. § 401 et seq., and predictably the weapons consist of alternative mathematical formulas for the calculation of benefits payable pursuant to a so-called "qualified" employee retirement pension plan. After losing the first-round skirmish when the District Court granted the defendant-Pensioner's motion for summary judgment, the trustees of the plan now attempt to bring up heavy artillery for reversal by contending that material issues of fact are as yet unresolved. The barrage is never zeroed in. We affirm.

Apart from the questions raised by the trustees regarding the propriety of summary judgment, the case is simply a matter of the correct interpretation of some

rather involved contractual and statutory language. Viewed from this angle our problem is to decide whether the plan's prescription for the redetermination of benefits in the event of an early termination of "qualified" status requires the computation of the number of years elapsed between the date of the plan's initiation and (i) the Pensioner's retirement date (as contended by the trustees) or (ii) the plan's termination date (as asserted by Cummings, the retired employee-Pensioner). With the District Court we conclude that despite its unavoidable and traditional prolixity the plan is not ambiguous when read in conjunction with the applicable Treasury regulations, and that a proper construction of it dictated on the undisputed facts a judgment for Pensioner.

Our analysis centers on the dissolved DeBardeleben Marine Corporation (formerly Coyle Lines) employee retirement plan and pension fund, established on July 1, 1956 and geared to qualify for the favorable tax treatment afforded by § 401 and § 501 of the Code. One of the requirements for qualification under these sections is that the plan must not discriminate in favor of certain classes of employees with respect to contributions or benefits provided,[1] and the applicable Treasury Regulations[2] imple-

1. "(a) Requirements for qualification.—A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section—

\* \* \* \* \*

(4) if the contributions or benefits provided under the plan do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees."

26 U.S.C.A. § 401(a).

2. "(2) (i) If employer contributions under a qualified pension plan may be used for the benefit of an employee who is among the 25 highest paid employees of the employer at the time the plan is established and whose anticipated annual pension under the plan exceeds $1,500, such plan must provide that upon the occurrence of the conditions described in subdivision (ii) of this subparagraph, the employer contributions which are used for the benefit of any such employee are restricted in accordance with subdivision (iii) of this subparagraph.

(ii) The restrictions described in subdivision (iii) of this subparagraph become applicable if—

(a) The plan is terminated within 10 years after its establishment,

(b) The benefits of an employee described in subdivision (i) of this subparagraph become payable within 10 years after the establishment of the plan, or

(c) The benefits of an employee described in subdivision (i) of this subparagraph become payable after the plan has been in effect for 10 years, and the full current costs of the plan for the first 10 years have not been funded. In the case of an employee described in (b) of this subdivision, the restrictions will remain applicable until the plan has been in effect for 10 years, but if at that time the full current costs have been funded the restrictions will no longer apply to the benefits payable to such an employee. In the case of an employee described in (b) or (c) of this subdivision, if at the end of the first 10 years the full current, costs are not met, the restrictions will continue to apply until the full current costs are funded for the first time.

(iii) The restrictions required under subdivision (i) of this subparagraph must provide that the employer contributions which may be used for the benefit of an employee described in such subdivision shall not exceed the greater of $20,000, or 20 percent of the first $50,000 of the annual compensation of such employee multiplied by the number of years between the date of the establishment of the plan and—

(a) The date of the termination of the plan,

(b) In the case of an employee described in subdivision (ii) (b) of this subparagraph, the date the benefit of the employee becomes payable, if before the date of the termination of the plan, or

(c) In the case of an employee described in subdivision (ii) (c) of this subparagraph, the date of the failure to meet the full current costs of the plan. However, if the full current costs of the plan have not been met on the date described in (a) or (b) of this subdivision, whichever is applicable, then the date of the failure to meet such full current costs

ment this standard by requiring each plan to incorporate specific restrictions limiting the maximum benefits payable to such employees in the event any one of three named contingencies should occur. Section 3.8(b) of the Coyle plan [3] contains these limitations, and both parties agree that the meaning of this provision (particularly the key phrase "multiplied by the number of years elapsed since July 1, 1956") controls the disposition of the case and must be determined by reference to the Regulations.

Before implementation of the DeBardeleben (Coyle) plan, and prior to each subsequent revision of it, the trustees secured a determination letter from the District Director of Internal Revenue approving qualification of the plan under § 401 [4] and exempting the pension fund under § 501. [5] In succeeding years several changes in the plan were made, including the addition of DeBardeleben Marine Corporation as a participant in September 1959 and a change in both name and trustees in February 1964. All such revisions were explicitly conditioned on the approval of the District Director and the continuation of exempt status.

Pensioner Marcellus Cummings was originally a Coyle Lines employee who elected to participate in the plan when it was inaugurated on July 1, 1956. He retired on April 30, 1962, having received an average annual salary during the preceding five years of $23,700. For the first 16 months following his retirement he received from the company's pension fund a monthly payment of $316.65. Then, on September 1, 1963, the fund purchased for him a single premium annuity policy costing $49,708.77 which since that date has paid him a monthly income of $319.65. Cummings' total contribution to the fund amounted to $5,335.56, while the 16 monthly payments he received before purchase of the annuity totaled $5,114.40. There is no dispute that he is one of the class of employees subject to the limitations on pension benefits contained in § 3.8(b) (note 3, *supra*).

The problem arises from the fact that the plan's qualified (exempt) status under Subchapter D was terminated by the District Director on May 31, 1966, thereby triggering the limitations. The surviving trustees under the plan, pursuant to an order of a Louisiana State District Court, were directed to seek recovery from participating employees of all excess benefits paid from the fund and thereafter to distribute ratably any recoveries to other pensioner-participants. Cummings refused their demands for reimbursement, contending that by the terms of the plan he had not been overpaid. Unable to resolve their conflicting interpretations of the cryptic proviso, the parties ended up in court, where the trustees sought a declaration of

---

shall be substituted for the date referred to in (a) or (b) of this subdivision. For purposes of determining the contributions which may be used for the benefit of an employee when (b) of this subdivision applies, the number of years taken into account may be recomputed for each year if the full current costs of the plan are met for such year."
§ 1.401–4(c) (2).

3. "LIMITATIONS ON PENSIONS: If, at any time prior to July 1, 1966, the plan is terminated or the current costs thereof are not met, the monthly pension payable to or on account of any participant to whom this section is applicable shall not exceed an amount equal to that which can be provided from the contributions made under the plan in respect of him—including funds attributable thereto, but excluding all contributions made under the plan by such participant as well as fund attributable thereto—such contributions not to exceed the larger of the following amounts: (i) $20,000; or (ii) the product of the lesser of the following amounts, *multiplied by the number of years elapsed since July 1, 1956*; (a) $10,000; or (b) an amount equal to 20% of the participant's average regular annual compensation received from an employer for the five calendar years immediately preceding his retirement under the plan."
(Emphasis added)

4. Treas.Regs. § 601.201(*o*).

5. Treas.Regs. § 601.201(n).

Cummings' obligations under the plan and a money judgment in the amount of $28,358.28.

The crux of the dispute involves the correct date to be used in computing "the number of years elapsed since July 1, 1956" (see note 3, *supra*). The trustees assert this phraseology to mean the number of years between the kick-off date and the date of retirement, in which event there would have been a $23,243.88 overpayment.[6] Cummings, on the other hand, contends that the time elapsed is to be computed by using the date the plan was terminated (May 31, 1966), in which event there was no overpayment at all.[7] In granting his motion for summary judgment the District Court adopted Cummings' formula.

■ In urging reversal the trustees contend not simply that the District Court misinterpreted the plan's provisions but also that the judgment cannot stand in any event because material issues of fact are still in dispute. If this were correct, reversal and remand would follow almost as a matter of course, since we have invariably rejected the appealing shortcut of summary judgment in lieu of trial when *genuine* (not illusory), *material* (not immaterial or irrelevant), *controverted* (not uncontested) issues of fact remain to be resolved. Cole v. Chevron Chemical Co., 5 Cir. 1970, 427 F.2d 390; United States v. Burket, 5 Cir. 1968, 402 F.2d 426; Braniff v. Jackson Ave.-Gretna Ferry, Inc., 5 Cir., 1960, 280 F.2d 523, on rehearing, 1961, 289 F.2d 939; Robbins v. Milner Enter-

prises, Inc., 5 Cir., 1960, 278 F.2d 492; Murphy v. Light, 5 Cir. 1958, 257 F.2d 323.

■ However, with equal consistency we have rejected the misconception that "it is the adversary, not the court, who must be satisfied and determine whether a genuine issue of fact exists." Bruce Construction Corp. v. United States, 5 Cir., 1957, 242 F.2d 873, 878; Jenkins v. Aquatic Contractors & Engineers, 5 Cir., 1971, 446 F.2d 520. There is no impediment to the entry of summary judgment when the dispute is verbal rather than factual. Almost as axiomatic is the principle that any genuine material issue of fact must somehow be shown to exist in the District Court. Where the moving papers do not reveal the presence of a factual controversy on a material issue, the adversary cannot simply assent by silence to the factual theory presented in the motion—and on which the parties stand in the Trial Court—and then assert thereafter on appeal as grounds for reversal a purported factual disagreement never before revealed. Christian v. Jemison, 5 Cir., 1962, 303 F.2d 52; Surkin v. Charteris, 5 Cir., 1952, 197 F.2d 77; 6 Moore, Federal Practice ¶ 56.27[1].

■ Judged by these standards the propriety of summary judgment here is undeniable. On appeal the trustees argue what is in effect an entirely new theory of the case, never presented to the District Court, based upon the ostensibly unresolved factual issue of whether the plan was fully funded up to its termina-

---

6. There is no dispute about the arithmetical calculation here and in note 7, *infra*. The computation under the trustees' method is as follows: $23,700 (average annual salary for the five years immediately preceding retirement) X 20% X 5.58331 (the number of years elapsed from July 1, 1956 to date of retirement) = $26,464.89 (maximum benefits). Subtracting this figure from the amount actually paid for the annuity policy ($49,708.77), the overpayment would have amounted to $23,243.88.

   The trustees actually sued for $28,358.28, but their formula incorrectly included the 16 monthly payments in computing

the benefits limitation. As the District Court properly held, § 3.8(a) of the plan and Treasury Reg. § 1.401–5(c) (4) (i) specifically exclude such payments from the calculation.

7. Using this approach the result would be: $23,700 X 20% X 9.91667 (number of years elapsed from July 1, 1956 to date of the plan's termination) = $47,005.02 (maximum benefits). Adding to this Cummings' contribution ($5,335.56), the total limitation would be $52,340.58, well in excess of the $49,708.77 cost of the annuity.

tion date.[8] There was not the slightest indication in the Trial Court that there was any question about funding. The battle was pitched over the choice of the two ending dates on the *assumption* that the condition of full funding had been satisfied. The Trial Court is not to be trapped by methods which focus on the critical decision, only to be brought up short in the appellate court by the belated argument that some condition implicit in the underlying controversy had not adequately been eliminated as a factual dispute. As the Trial Court saw it—and was entitled to see it—both parties assumed full funding in arguing for their respective interpretations of the limitations provision.[9] We cannot now recognize this D-minus one attempt to resurrect and breathe new juridical life into a moribund issue strangled in its crib by appellants' inaction.

Trustees next argue that the District Court incorrectly assumed that another participant in the plan Henry DeBardeleben, did not retire but instead continued his employment with the company until his death on April 8, 1964.[10] The purported relevance of this issue arises from the trustees' assertion that the District Director recomputed Henry's entitlement to pension benefits by using in the formula the date of retirement rather than the date of termination, thereby dictating that the same date be used in calculating Cummings' entitlement.

For several reasons the argument is unpersuasive. In the first place even if Henry DeBardeleben's benefits were computed by utilizing the date of retirement, the District Court was not bound to accept as conclusive of the legal issue the fact that the Internal Revenue Service had used the retirement date in applying the formula to another employee. Its task was to interpret the contract between the parties, not to determine how the District Director had interpreted the contract between Henry and the company.

Even more significantly, however, as clearly revealed by the letter notifica-

8. Obviously the relevance of this assertion arises from the fact that under Reg. § 1.401–4(c) (2) (iii) (c) the date of the failure of the plan to meet full current costs, if occurring earlier than either the date of termination or the date of retirement, would be used in computing the limitation on benefits. In arguing their respective positions neither party adverted to this subsection, and the District Court did not even consider it. It is injected into the controversy now only as part of a last-ditch effort to find a controverted issue of fact.

9. The trustees' use of the date of retirement in *their* formula, as revealed by their calculations filed in the District Court (Plaintiffs' Exhibit 2, App. 36), conclusively establishes that the plan was fully funded up to that date, since an earlier date would have resulted in an even greater limitation on benefits. At best they hope to create a factual issue from the bare assertion that on some date between retirement and termination the full current costs of the plan were not met. But this contention is merely the classic case of too little too late.

Although by supplemental brief Pensioner has made a powerful showing to this Court that the plan was fully funded, we need not reach this argument, nor the question of the propriety of this Court "resolving" the problem of the controverted issue. However, the trustees' misconception of the role of summary judgment is markedly revealed by the response filed here to overcome the almost positive position of Pensioner. In his affidavit all the trustee says is that to the best of his "knowledge, information, and belief" there were "certain years in which all costs of the plan * * * were not met."

Conclusory as this affidavit is, lacking entirely in the factual specificity of readily available arithmetical facts, it does not even begin to satisfy the technical requirements of F.R.Civ.P. 56(e) concerning proof. At this juncture it shows also that at no time—below or now here—have the trustees come even close to showing that there is a real issue of fact on this score.

10. In effect the trustees' position is that the District Court incorrectly assumed that because Henry remained as trustee under the plan until his death he could not have retired from the firm. Although we agree with this contention, since there is no apparent reason why he could not have been a retiree and a trustee at the same time, it means nothing here.

tion of termination (App. 109–110), it was the claimed overpayment to Henry DeBardeleben that resulted in termination of the plan's qualified status in the first place. Yet when the plan was terminated on May 31, 1966, Henry had been dead for more than two years. Certainly not he—and presumably none of his heirs or legal representatives—were then in a position to assert that his entitlement should be recomputed using the date of termination rather than the date of retirement. On the other hand, if he had survived, he clearly would have been entitled to such a recalculation under Reg. § 1.401–4(c) (2) (iii) (c), assuming that the full current costs of the plan had been met during the interim. As the District Court correctly concluded, Cummings was entitled to similar adjustments. The fact that Henry or his successors did not assert an equivalent right because of his unfortunate death was totally irrelevant to the computation to be used in this case.

The remaining points raised by the trustees are not really factual issues at all. For example, they contend that the District Court misunderstood the nature of the relief sought when it stated that "the plaintiff trustees seek to recover from defendant the difference between what the fund actually paid for the premium on [Cummings'] annuity and what they claim the fund should have paid for it, which was the sum of $28,358.28." According to appellants, what they actually sought to recover was the difference between the total amount paid to Cummings in pension and annuity benefits and the amount that should have been paid in light of § 3.8(b)'s restrictions. We profess an inability to comprehend the nice distinctions asserted on the suggestion that the Judge must be faulted for his description of the problem, which we characterize as did he. Giving it more due than is warranted, the District Court's statement must be considered in connection with its later holding, with which we have agreed (see note 6, supra), that the 16 monthly pension payments were to be excluded from the calculation of the benefits limitation. Viewed from this perspective the Court's statement, if somehow lacking in accurateness, is nevertheless not plainly wrong, and in any event it does not involve a material issue of fact upon which the final judgment rests.

Finally, the trustees suggest as grounds for reversal an obvious typographical error in the District Court's final order. Since the regulation to which the Court referred is clear from the context, this contention must be dismissed as frivolous.

■ After this diversion resulting from the effort to create factual controversies which did not occur earlier to anyone close to this case or its management, we come back to the uncontested facts presented and the District Court's interpretation of the contractual limitation provision. Clearly his construction was the correct one. The language was not ambiguous. It provided that whenever the plan terminated or ceased to be fully funded the maximum pension benefits would be recomputed using the formula contained in § 3.8(b), including "the number of years elapsed since July 1, 1956." No reference whatever was made to the date of retirement as a possible variable in this equation. When the trustees nevertheless asserted that this provision had to be read in conjunction with the corresponding sections of the Treasury Regulations, the District Court obliged and concluded that § 1.–401–4(c) (2) (iii) (c) dictated that the number of "elapsed" years be extended past the date of retirement so long as the plan was fully funded. Such an interpretation is clearly consistent with the language and purpose of both the plan and the Regulations, and its inevitable consequence cannot now be evaded by the simple expedient of contending that it is grounded on a material but heretofore undisputed issue of fact.

Summary judgment, often thought to be unavailable, is once again proved to be a valuable tool in the law's effort to stem the tide of flooding litigation. The parties are not to be trapped into waiv-

ing a plenary trial on issues that really exist. But neither is the Judge, the opposition nor the jurisprudence to be trapped by feigning an issue, so nonexistent as to be unrealized by combatting adversaries, in order to require a trial not on substantial issues but on ones that at most were merely not expressly negated and at best involved only "the optimistic hope that something might turn up." Bruce Construction Corp. v. United States, *supra*, 242 F.2d at 878. Such an approach is a distortion of the whole spirit of F.R.Civ.P. 56.

Affirmed.