Dan SULLIVAN, by next friend, Daniel H. Sullivan, et al., Plaintiffs-Appellees, and

Paul Kitchen, by next friend, Anthony Kitchen, Plaintiff-Appellee-Cross Appellant,

v.

HOUSTON INDEPENDENT SCHOOL DISTRICT, et al., Defendants-Appellants-Cross Appellees.

No. 71–2494.

United States Court of Appeals, Fifth Circuit.

March 15, 1973.

Rehearing and Rehearing En Banc Denied April 30, 1973.

William Key Wilde, Kelly Frels, Bracewell & Patterson, Houston, Tex., for appellants.

Robert E. Hall, Eric H. Nelson, Houston, Tex., for appellees.

Before GEWIN, THORNBERRY and CLARK, Circuit Judges.

THORNBERRY, Circuit Judge:

This case arises from the unauthorized distribution of an "underground" newspaper near a high school campus, and presents the now-familiar clash between claims of First Amendment protection on the one hand and the interests of school boards in maintaining an atmosphere in the public schools conducive to learning, on the other. We vacate the supplemental grant of injunctive relief to plaintiff-appellee Paul Kitchen. In doing so, we hope to furnish guidelines that will prove helpful to all parties—students, school officials, and courts—in balancing the competing interests in this delicate and crucial area of the law.

The case is here on appeal from an order of the district court, 333 F.Supp. 1149, supplementing a 1969 permanent injunction. The facts giving rise to that first permanent injunction are set out at 307 F.Supp. 1328, and need not be recounted here. Suffice it to say that Dan Sullivan and another student at Sharpstown High School in Houston had been summarily expelled for distributing, free of charge, a publication of their own creation, *Pflashlyte*. This disciplinary action had been taken ostensibly as punishment for the boys' violation of an extremely vague regulation of the Houston Independent School District [1] and of the school principal's unwritten and unannounced interpretation of that regulation.[2] The boys filed suit in the court below seeking declaratory and injunctive relief under 42 U.S. C. § 1983. After issuing a comprehensive memorandum, Judge Woodrow Seals set out detailed requirements to be met by the School District in regulating student distribution of literature on or near the campus and in disciplining students for violations of school regulations.[3]

---

1. That regulation read as follows:
 The school principal may make such rules and regulations that may be necessary in the administration of the school and in promoting its best interests. He may enforce obedience to any reasonable and lawful command.

2. The School District stipulated that
 the rule [quoted above] is construed by responsible officials of the Houston Independent School District to prohibit the type of publication and distribution engaged in by Michael Fischer and Dan Sullivan in February ·and March of 1969.

3. In a permanent injunction decree and declaratory judgment rendered on De-

cember 30, 1969, Judge Seals enjoined the School District from promulgating or enforcing any regulation dealing with the production or distribution of written materials by tenth, eleventh, and twelfth grade students, unless the regulation was in writing and students were given notice of the rule, and unless it met the following conditions:
 (1) The rule must be specific as to places and times where possession and distribution of published materials is prohibited.
 (2) The rule must be understandable to persons of the age and experience of covered students.
 (3) The rule must not prohibit or inhibit conduct which is orderly, peaceful and reasonably quiet and which is

The School District appealed from this order, but the appeal was dismissed on the District's own motion on May 21, 1970.

Rather than prosecute the appeal, the School District chose to formulate a new set of regulations. A biracial committee of students, school officials, parents, attorneys, and representatives of other interested groups held hearings and developed an extensive set of regulations dealing with various aspects of school discipline. The rules required prior submission to the school principal of all publications, not sponsored by the school, which were to be distributed on the campus or off campus in a manner calculated to result in their presence on the campus. The principal was given one working day to review the publication before general distribution. If, in the opinion of the principal and School District attorneys, the publication contained "libelous or obscene language or advocate[d] illegal action or disobedience to published rules on student conduct adopted by the Board of Trustees," then the principal could withhold his approval of the publication and it could not be distributed. The rule provided, however, that distribution could not be prohibited because the publication "contained the expression of any idea, popular or unpopular." Besides requiring prior submission, the regulation expressly permitted distribution before and after school hours on school premises, absolutely prohibited the sale of publications on school premises and the distribution of political campaign material or material consisting primarily of commercial advertising, and required that the publication contain the names of the contributors, editors, and publishers.

In addition to these provisions governing distribution of publications, the new regulations contained specific provisions governing suspension procedures. For violation of any published regulation of the School District governing student conduct, a student could be suspended for a reasonable time not exceeding three school days upon the giving of written notice to parents or guardian of the reasons for the suspension. If the suspension was to last for more than three school days or for an indefinite period, the student and his parents or guardian were entitled to written notice of the reasons for suspension and were

not coercive of any other person's right to accept or reject any written material being distributed subject to the rule.

(4) The rule may prohibit such distribution at times and in places where normal classroom activity is being conducted. Such rule may not prohibit such distribution at other times and places unless such prohibition is necessary to prevent substantial and material interference with or delay of normal classroom activity or normal school function. . . . [There follow definitions of "normal classroom activity" and "normal school function."]

(5) The rule must not subject any covered student to the threat of discipline because of the reaction or the response of any other person to the written material, provided, however, that defendants and their successors in office may prohibit distribution of obscene material or of libelous material for which a cause of action may exist in some person."

In addition, the decree set out the following requirements that the District was to meet in imposing "substantial discipline"

(i. e., suspension for more than three days, or for an indefinite period) :

(1) The covered student and at least one of his parents or guardian shall be furnished, either in person or by mail directed to the student's last known address, with written notice of the charges and of the nature of the evidence against such covered student.

(2) The covered student and at least one of his parents or guardian shall be offered a formal hearing after sufficient time to prepare a defense or reply at which hearing evidence in support of the charge shall be presented by school officials and the affected covered student or his parent or guardian shall have ample opportunity to present any defense or reply.

(3) The decision of school officials to impose such discipline shall be based upon a dispassionate and fair consideration of substantial evidence that the covered students committed the acts for which discipline is to be imposed and that such acts are in fact a proper reason for such discipline.

to be offered a prompt hearing before the principal, at which they could produce witnesses and be assisted by counsel. The student was to be given the right to appeal the principal's decision to the assistant superintendent for a *de novo* hearing. The assistant superintendent could affirm the principal's decision if the *de novo* hearing produced substantial evidence supporting it, and the student could appeal the assistant superintendent's decision to the School Board. The School Board adopted the new regulations in February or March 1970, and copies were posted in each school building in the District. Several months later, the event occurred that forms the basis for the instant appeal.

Before classes started on the morning of October 20, 1970, Paul Kitchen, a junior student at Waltrip Senior High School, was standing near an entrance to the campus selling *Space City!*, an "underground" newspaper, to students as they entered the campus. Gordon Cotton, the Waltrip principal, purchased a copy and scanned its contents. On the second page he noticed a letter, captioned "High Skool is F. . .ed" and containing several other instances of coarse language. Mr. Cotton told Paul that he was selling the papers in violation of the prior submission rule, and asked him to stop. Paul continued selling the papers. At this point, Mr. Cotton determined to suspend Paul for his failure to comply with both the prior submission rule and Mr. Cotton's request that he stop selling the papers. Before Paul was sent home, Mr. Cotton notified both his parents by telephone that Paul was being suspended and told them the reasons for his decision. Mr. Cotton requested that both parents come to the school for a conference, but Mr. Kitchen replied that his job would prevent his attending a conference until six days later. A conference was agreed to be held on October 26, 1970, and it was agreed that Paul would remain on suspension until that date. As Paul was leaving Mr. Cotton's office after being informed that he was to be suspended, he slammed the door and shouted "I don't want to go to this goddamn school anyway" within the hearing of two of Mr. Cotton's female assistants.

During the period of Paul's agreed suspension between October 20 and October 26, he returned to the campus several times purportedly to talk with his teachers. Each time school officials told him to leave the campus because students were not allowed on school premises while under suspension. On the morning of October 26, the day on which the conference with Paul's parents was scheduled, Paul was again at the entrance to the campus selling *Space City!* to students on their way to school. Mr. Cotton showed Paul a copy of the prior submission rule, and told him that if he did not stop selling the papers he would call the police. In response, Paul shouted "the common Anglo-Saxon vulgarism for sexual intercourse" in apparent reference to Mr. Cotton. Paul was taken to the police station but was released without charges having been filed. Mr. Kitchen obtained legal counsel and failed to appear for the scheduled conference with Mr. Cotton. Later that day, Mr. Cotton notified Paul's parents in writing that he was suspending Paul for violating the prior submission rule and using profanity in the presence of his secretary, and informed them of the suspension procedures available to students and parents under the new regulations.

On October 29, 1970, Mr. Cotton conducted a hearing at which Paul was represented by counsel. Following the hearing Mr. Cotton suspended Paul for the remainder of the semester, on the basis of Paul's violation of the prior submission rule and his use of profanity toward Mr. Cotton. A *de novo* appellate hearing was conducted before the assistant superintendent on November 9, 1970. Paul appeared with his father and an attorney; an extensive evidentiary hearing was held during which witnesses were cross-examined and testimony was transcribed by a court reporter. The assistant superintendent affirmed Mr. Cotton's decision; and the

transcript of the appellate hearing was reviewed by the Deputy Superintendent for Secondary Schools and the Superintendent for Instruction and Administration, who both affirmed the suspension.

On November 23, 1970, Paul and his father applied in the court below for an order holding the School District in contempt for violating the 1969 permanent injunction, and for supplementary injunctive relief and damages in aid of the injunction. On the following day the court entered an *ex parte* temporary restraining order directing that Paul be permitted to attend classes at Waltrip High School; without the consent of the School District, this temporary restraining order was extended for ten-day periods for a total of fifty-nine days. At the direction of the court, a four-hour hearing was held before the School Board, at which Paul and his father, represented by counsel, presented and cross-examined witnesses. The Board declined to entertain a facial challenge to the new regulations, ordered Paul suspended for an additional two weeks beginning January 4, 1971, and directed that he be placed on probation for the remainder of the school year.

Following a hearing, the court below chastised Paul for not challenging the new regulations by orderly means, found that he had been unlawfully suspended, ordered that he be allowed credit for school work missed during the suspension, and declined to hold the School Board in contempt or award damages or attorney fees because the defendants had acted in good faith. On October 7, 1971, the court issued a supplementary injunctive decree, clarifying and elaborating the terms of its original 1969 injunction. Both sides appeal, urging a myriad of contentions regarding the trial court's refusal to vacate the 1969 permanent injunction, the reasons for suspending Paul, the procedures used in his suspension, and the failure to award damages and attorney fees. The view we take of this case makes it necessary for us to address only a few of these contentions.

I

■ On appeal and in the court below, Paul Kitchen's position has been, basically, that his selling the newspaper was an activity protected by the First Amendment. Pointing to the fact that sale of the newspaper created little, if any, disruption of normal school activities—let alone the "material and substantial" disruption required by Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), and its progeny—he argues that the prior submission rule was unconstitutionally applied to him. He claims further that the language in the newspaper was not constitutionally obscene and that therefore the school officials could not suppress it. In our view, however, Paul's conduct in the instant case outweighs his claim of First Amendment protection, and gave school officials sufficient grounds for disciplining him.

As the court below recognized when it rebuked Paul for failing to challenge the prior submission rule by "lawful" means, Paul's conduct can hardly be characterized as the pristine, passive acts of protest "akin to pure speech" involved in *Tinker, supra.* Rather, Paul defied Mr. Cotton's request that he stop selling the newspapers, persisted in returning to the campus during the initial six-day suspension period, and twice shouted profanity at Mr. Cotton within the hearing of others. Paul's reappearance on the campus and continued sale of the newspapers on October 26 served only to exacerbate the situation.

Moreover, Paul never once attempted to comply with the prior submission rule. Given the widespread publicity accorded the new rules, it taxes credulity to say that on October 20 Paul was unaware of the rule requiring prior submission; he most certainly knew about the rule after Mr. Cotton showed him a copy on October 26 before suspending him for a second time. Had Paul submitted the newspaper prior to distribution and had it been disapproved, then

he could have promptly sought relief in the courts without having been first suspended from school. Having chosen to disregard established school policy regarding distribution of off-campus literature, Paul's opportunity for obtaining relief from the principal's decision was delayed by several months of administrative appellate hearings, during which his academic career suffered severely from continued suspension.

Considering Paul's flagrant disregard of established school regulations, his open and repeated defiance of the principal's request, and his resort to profane epithet, we cannot agree that the school authorities were powerless to discipline Paul simply because his actions did not materially and substantially disrupt school activities. In the years since *Tinker* was decided courts have refused to accord constitutional protection to the actions of students who blatantly and deliberately flout school regulations and defy school authorities. Thus, in Schwartz v. Schuker, E.D.N.Y.1969, 298 F.Supp. 238, a high school student disregarded several prior warnings of the principal not to distribute literature without prior permission. The court declined to reach the student's constitutional arguments and refused to grant him injunctive relief because he had failed to challenge the principal in an orderly manner. The same result was reached in Graham v. Houston Independent School District, S.D.Tex.1970, 335 F.Supp. 1164, where Judge Ingraham of this court, sitting as a district judge by designation, based his denial of injunctive relief on the student's disregard of established school regulations. *See also* Duke v. North Texas State Univ., 5th Cir. 1972, 469 F.2d 829; Esteban v. Central Missouri State College, 8th Cir. 1969, 415 F.2d 1077; Quarterman v.

Byrd, 4th Cir. 1971, 453 F.2d 54, 60 n. 11. Finally, in Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), the Court approved the principle that the open disregard of school regulations is a sufficient and independent ground for imposing discipline, when, citing *Esteban, supra,* it held that a student group's announced refusal to abide by campus regulations would be a proper reason for denying university recognition to the group. 92 S.Ct. at 2351–52.

■■ It may be noted that the regulations in the instant case are the product of an extensive and good faith effort by the School District to formulate a valid code of student conduct. This court has recognized that there is nothing *per se* unreasonable about requiring a high school student to submit written material to school authorities prior to distribution. Shanley v. Northeast Independent School Dist., 5th Cir. 1972, 462 F.2d 960.[4] And it cannot be seriously urged that this prior submission rule is unconstitutionally vague or overbroad; this court has recently upheld a statute cast in more general terms than is the rule in question here. Pervis v. LaMarque Independent School Dist., 5th Cir. 1972, 466 F.2d 1054. Finally, it is undisputed that substantial evidence supported Paul's suspension. Accordingly, we limit our review of his suspension to the question whether the School District accorded him due process.

We hasten to point out that by thus limiting our review in this case we do not invite school boards to promulgate patently unconstitutional regulations governing student distribution of off-campus literature. Nor, needless to say, do we encourage school authorities to use otherwise valid regulations as a pretext for disregarding the rights of stu-

---

4. *Both* Shanley and Eisner v. Stamford Bd. of Educ., 2nd Cir. 1971, 440 F.2d 803, require that prior submission rules include procedures for prompt administrative review of a decision not to permit distribution. The regulations of the Houston Independent School District contain no. such procedure for appellate re-

view. However, since Paul never submitted the newspaper for prior approval in the first place and since he was given two extensive *de novo* appellate hearings in which he could have urged approval of the newspaper for distribution, this defect in the prior submission rule should not affect the result in the instant case.

dents. Today we merely recognize the right of school authorities to punish students for the flagrant disregard of established school regulations; we ask only that the student seeking equitable relief from allegedly unconstitutional actions by school officials come into court with clean hands.

## II

■ As to the procedures used in his suspension, the thrust of Paul's attack is that the October 29 hearing before Mr. Cotton was not the "fair and dispassionate" hearing required by due process and by the original permanent injunction. Although this court has never adopted a rule that school administrative personnel involved in the initiation and investigation of charges are *per se* disqualified from conducting hearings related to those charges, *see* Murray v. West Baton Rouge Parish School Bd., 5th Cir. 1973, 472 F.2d 438; *Duke, supra;* Lance v. Thompson, 5th Cir. 1970, 432 F.2d 767; *cf.* Wasson v. Trowbridge, 2nd Cir. 1967, 382 F.2d 807; Jones v. State Bd. of Educ., M.D.Tenn. 1969, 279 F.Supp. 190, aff'd, 6th Cir. 1969, 407 F.2d 834, cert. dism'd, 397 U. S. 31, 90 S.Ct. 779, 25 L.Ed.2d 27 (1970), we have uniformly recognized that the facts of a case may demonstrate that a school official's involvement in an incident is such as to preclude his affording the student an impartial hearing. *E. g. Murray, supra; cf.* Mayberry v. Pennsylvania, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971). In our view, Paul Kitchen made such a showing in the instant case. The incidents for which Paul was suspended were cast largely in terms of a personal confrontation with Mr. Cotton. On two occasions Paul used profanity toward him, and Paul's appearance on the campus on October 26 to resume sales of the newspaper was clearly a direct challenge to Mr. Cotton's earlier demand that Paul stop selling the newspaper. Under these cir-

cumstances it is difficult to imagine that Mr. Cotton could have given Paul an impartial hearing. Indeed, it is not surprising that Mr. Cotton's primary aim in conducting the October 29 hearing was not to hear Paul's side of the story but rather, as Mr. Cotton testified in the district court, to hear Paul apologize.

■ It is, however, well settled that a procedural defect in an initial hearing before school officials can be cured by subsequent hearings. *Murray, supra;* Speake v. Grantham, 5th Cir. 1971, 440 F.2d 1351, aff'g S.D.Miss.1970, 317 F. Supp. 1253.[5] In the instant case, Paul was afforded two extensive *de novo* appellate hearings at which he was represented by counsel and presented and cross-examined witnesses. In our view, the procedural fidelity that characterized these appellate hearings cured the procedural defect in the hearing before Mr. Cotton.

■ We believe that a further word is necessary with regard to the timing of Paul's hearings, although neither party raises the issue directly. The question whether, and under what circumstances, disciplinary action must be *preceded* by a hearing has recently been before this court on a number of occasions. Black Students of North Fort Myers Jr.-Sr. High School v. Williams, 5th Cir. 1972, 470 F.2d 957 [1972] (hearing required before imposition of up to ten days' suspension); *Pervis, supra* ("an even more basic tenet of due process is . . . that punishment cannot be imposed before a hearing is given"); Dunn v. Tyler Independent School Dist., 5th Cir. 1972, 460 F.2d 137 (no hearing required for "minor" punishment such as three days' suspension); Banks v. Bd. of Public Instruction, S.D.Fla.1970, 314 F.Supp. 285 (3-Judge court), vacated for entry of single-judge order, 401 U.S. 988, 91 S.Ct. 1223, 28 L.Ed.2d 526 (1971), aff'd after remand, 5th Cir.

---

5. We note that the facts of the instant case are distinguishable from those in *Pervis, supra,* where no hearing was held until three months after the students' summary suspension.

1971, 450 F.2d 1103 (no prior hearing required for suspension up to ten days). In this case, Paul was suspended initially for an agreed period of six days without having been given a prior hearing. The lack of a hearing, however, was due to the unusual requirements of Mr. Kitchen's work which prevented his attendance until six days after the suspension had been imposed. On October 26, Mr. Cotton again suspended Paul, this time indefinitely. No hearing was held until three days later. But it must be recalled that the October 26 hearing would have taken place and the second suspension might not have occurred if Paul had not returned to campus on October 26 and resumed selling the newspapers, an event that triggered Mr. Cotton's calling the police and Mr. Kitchen's refusal to attend the October 26 hearing. Under these circumstances, and considering Paul's part in the delay, we decline to hold that the lack of a prior hearing was a denial of due process. The hearing was held as soon as circumstances would permit.

 All that remains is the question whether the court below abused its discretion in denying the School District's motion made pursuant to Rule 60(b), F.R.Civ.P., to vacate the original 1969 permanent injunction. The School District's position is that, by promulgating new regulations that literally comply with the conditions set out in the injunction, the 1969 judgment has been "satisfied," and there is no longer any need to keep the School District under threat of a contempt judgment for violating the injunction. Granting relief pursuant to Rule 60(b) is largely within the discretion of the trial court, Elgin National Watch Co. v. Barrett, 5th Cir. 1954, 213 F.2d 776, and we are unable to say that the court below abused that discretion in failing to vacate the injunction. The original injunction dealt not only with the promulgation of regulations, but also with their enforcement. The School District has failed to show that continuation of the 1969 injunction is unnecessary to insure that the rules will not be unconstitutionally applied to students in the future. Although the District cites extensive authority for the familiar proposition that school discipline is primarily a matter for school authorities, the treatment that we give the instant case recognizes the District's right to impose punishment for violation of its established regulations. We decline to disturb the trial court's choice not to vacate the 1969 permanent injunction.

With the exception of that part of the order denying the School District's motion to vacate the 1969 injunction, the supplemental injunction decree entered on July 6, 1971, and the supplementary permanent injunctive decree entered on October 7, 1971, are vacated with instructions that the suit be dismissed.

Vacated with instructions.