**E. C. ERNST, INC., Plaintiff-Appellant,**

v.

**GENERAL MOTORS CORPORATION and the Whiting-Turner Contracting Company, Defendants-Appellees.**

No. 72-2201.

United States Court of Appeals, Fifth Circuit.

July 24, 1973.

Glower W. Jones, Aubrey L. Coleman, Jr., Atlanta, Ga., for plaintiff-appellant.

R. Byron Attridge, Joseph B. Haynes, Atlanta, Ga., Ross L. Malone, Detroit, Mich., for Gen. Motors Corp.

Charles T. Lester, Jr., James P. Groton, Atlanta, Ga., for Whiting-Turner.

Before JOHN R. BROWN, Chief Judge, and WISDOM and AINSWORTH, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The question is whether summary judgment should have been granted below against an electrical subcontractor [1] in an action seeking damages for breach of contract against the general contractor [2] and the owner.[3] The trial court concluded that the action was barred because Plaintiff below had failed to comply with the notice provision in the contract under which it was suing.[4] After carefully reviewing the record, under the usual standard, we have concluded that the court below erred in finding the nonexistence of any triable issue of fact and entering judgment for Defendants below as a matter of law. Dunnington v. First Atlantic National Bank of Daytona Beach, 5 Cir., 1952, 195 F.2d 1017.

Summary judgment as envisioned by F.R.Civ.P. Rule 56, 28 U.S.C.A. is a method of testing in advance of trial, not as formerly on bare contentions found in the legal jargon of pleadings, but on the intrinsic merits, whether there is in actuality a real basis for relief or defense. Bruce Construction Corp. v. United States, 5 Cir., 1957, 242 F.2d 873, 874. When a movant makes out a convincing showing that genuine issues of fact are lacking, it becomes incumbent on the adversary to adequately establish by receivable facts that a real, not formal, controversy exists. Stopping short of expressing any opinion as to how the trier should resolve the fact issue ultimately, we think Appellant has made the required showing and should have been allowed to go to trial.

Perspective into the posture of the parties in this dispute may be gained by briefly reciting the events preceding the filing of the suit. On April 18, 1967 Appellant entered into a contract with General Motors Corporation which required that it provide labor and materials to perform electrical work in the con-

---

1. E. C. Ernst, Inc.

2. Whiting-Turner Contracting Company.

3. General Motors Corporation.

4. Failure to comply with the notice provision was the basis of the trial court's grant of summary judgment. The court never reached our other separate and distinct defenses raised by Defendants below. These were:
 (i) Ernst accepted final payment for all work under the contract between it and General Motors, thereby waiving all alleged claims by it under paragraph 6, Article III of the contract and under the electrical work specifications.
 (ii) The contract limited the remedy for any purported delay to an extension of time to complete the contract and precluded any claim for damages.
 (iii) Ernst failed to prosecute a request for any extension of time under the contract.
 (iv) Ernst settled any and all claims cognizable under the contract on October 29, 1968 and received approximately $20,000 therefore.

struction of the General Motors Lakewood New Final Process Building in Atlanta. The contract required that General Motors pay Appellant $356,950.00 therefor. Though the contract was negotiated and concluded between only Appellant and General Motors Corporation, it was generally understood between the parties that ultimately the contract would be assigned by General Motors to a general contractor such that Appellant would perform its contractual obligations as a subcontractor. In the contract General Motors specifically reserved the right to make such an assignment.[5]

Prior to the conclusion of Appellant's contract, General Motors, on April 6, 1967, had entered into a contract in the amount of $1,279,470.00 with Whiting-Turner Contracting Company for construction of the Lakewood New Final Process Building. The contract specifically provided that Whiting-Turner, as the general contractor for the project, would assume the contract covering the electrical work.[6]

In its contract with GM, it was expressly stated that Appellant would be able to (i) "start work immediately and proceed with the utmost dispatch and diligence" and (ii) "complete all work contemplated hereunder in accordance with the schedule set forth on page 1–E–11 of the Special Conditions." It was further declared that "time was to be of the essence."

Notwithstanding the urgency expressed in the contract, and through no fault of its own, Appellant was unable to begin work immediately. The project, initially scheduled to be fully completed in less than one year hence, was seriously delayed from the beginning by GM's rough grading contractor who was approximately six weeks behind schedule in site preparations. GM's Field Representative at the project site testified that the reasons for the delay, at least partially, were that the rough grading contractor had failed to follow instructions, failed to have sufficient men and equipment on the job, and failed to have adequate supervision on the job. Appellant was formally advised of this delay at a "contractors progress meeting" held on May 1, 1967.[7] Immediately after this meeting Appellant protested its inability to begin work "without delay" by a letter addressed to Whiting-Turner.[8]

By the terms of Appellant's contract, the building was to be ready for GM's beneficial occupancy on or before December 1, 1967, with the entire project

---

5. Appellant's contract with GM in paragraph 50 entitled "Assignment of Contract to General Contractor" provided:
 The Owner reserves and is hereby granted the right to assign this Contract to the General Contractor and make same a part of the General Contract. The Contractor for this trade agrees that, in the event of such assignment, he will work under the General Contractor in the same manner as he would had the Contract been originally awarded to him by the General Contractor; and, further, that he will be bound to and assume toward the General Contractor all the obligations and responsibilities that he, by this Contract, assumes toward the Owner.

6. Article IV, paragraph I of the contract between GM and Whiting-Turner provided in part:
 * * * * *
 It is agreed that the Owner [GM] will assign to the General Contractor

[Whiting-Turner], and the General Contractor shall assume, as Subcontractors, the Purchase Order and Contracts entered into by the Owner covering Mechanical Trades, Electrical and Fire Protection Work in connection with the construction and completion of the project contemplated hereunder;
 * * * * *

7. See note 14, infra.

8. This letter, which was addressed to the Whiting-Turner Construction Company, stated in part: "We cannot be held liable for late start dates beyond our control, without additional compensation and/or extension of time. Our proposal for compensation for this late start date will be forthcoming when the work presently under construction is completed and an official start date is assigned to the Whiting-Turner Construction Company."

due to be completed on or before April 11, 1968. To assist in meeting these contract completion dates, Appellant's contract required that the Critical Path Method (CPM) be used to plan and schedule all phases of the project. The preparation and final submitted to GM of a CPM, which was the responsibility of Whiting-Turner, had not been accomplished as late as September 26, 1967. The result was that Ernst and others working on the project received written instructions in the form of progress meeting minutes and bar charts which reflected changing beneficial occupancy dates. The beneficial occupancy date finally achieved was not until late March or early April of 1968 with final completion of the project not occurring until September of 1968. On January 5, 1969, Appellant presented to GM a 180 page "claim booklet" seeking payments in the amount of $134,000.00 for purported delays and inefficiencies in completion of the project.

The suit below, initially filed in state court, alleged breach of an electrical construction contract in that Defendants delayed and disrupted Plaintiff's performance, thereby requiring Plaintiff to perform its contract over an extended period of time and in an inefficient and more costly manner. After removal, Defendants entered general denials and pled certain defenses which were to also provide the grounds for their motion for summary judgment which was made after discovery. On Defendant's motion for summary judgment the court held that the Plaintiff's entire cause of action as to both Defendants was barred by the Plaintiff's failure to strictly comply with the notice provisions contained in paragraph 52 of the contract, entitled "Procedure for Alleged Change in Cost —Contractor's Supervision." [9] The

9. The entire text of paragraph 52 provides:

PROCEDURE FOR ALLEGED CHANGE IN COST—CONTRACTOR'S SUPERVISION

(a) Should the Contractor perform any work or should he proceed in any manner which he may subsequently allege has caused him increased cost, damage, or loss, purporting, in each case to have acted upon verbal instructions or with tacit consent or acceptance or approval other than written from the Purchasing Department, the Contractor shall be held to have no claim against the Owner or the Architect-Engineer on account of the alleged increased cost, damage or loss.

(b-1) The contractor shall keep on the work, during its progress, a competent Superintendent and any necessary assistants. The Superintendent shall represent the Contractor on the site of the work and all directions given to him shall be as binding as if given to the Contractor.

(b-2) If the Contractor shall contend that such directions will result in an increase in the cost of the work, damage or loss, and that he is entitled to payment by the Owner by reason thereof, the Contractor shall, within four (4) days of the receipt of such directions, except in an emergency notify the Architect-Engineer and Purchasing Department, in writing, of his contentions, the amount of his claim with respect thereto, and all details in connection therewith. He shall not proceed with such directions or with the work affected thereby until he has received, in writing, acknowledgment of the claim by, and instructions from the Purchasing Department. The Contractor shall comply with such written instructions, and unless said claim is finally disposed of by said acknowledgment and instructions said compliance shall be without prejudice to the rights of the Contractor and Owner. In the event of an emergency, the Contractor shall proceed with that work necessary and shall keep accurate and complete records of the costs of such work, which records shall be presented to the Architect-Engineer and Purchasing Department as soon as the emergency ceases to exist.

(c-1) If the Contractor shall contend that he is entitled to payment from the Owner for increase in the cost of the work, damage or loss, because of any action, or omission of the Owner, or others engaged by the Owner, during the performance of the work, the Contractor shall not delay his work on account thereof and shall, within seven (7) days after the first observance of such occurrence, notify the Architect-Engineer and the Purchasing Department, in writing, of his contentions, the amount of his claim with respect thereto, and all details in connection therewith.

court specifically found that the procedure contained in section (c–1) of paragraph 52 was directly applicable to claims such as Plaintiff's which sought "damage or loss because of any action or omission of the owner, or others engaged by the owner, during the performance of the work * * *" (note 9, *supra*).

Plaintiff's rejoinder below, and its contention here on appeal, is two-pronged. The first prong alleges that the provision of paragraph 52 which is applicable to its claims is section (a) which deals with increases in costs resulting from verbal instructions from the Purchasing Department [of General Motors] (see note 9, *supra*). Appellant contends that notice was not required because the increased costs resulted from written directives from Appellees. These written directives, it is contended, were in the form of minutes of progress meetings, letters and bar charts. Part (c) of paragraph 52, appellant maintains, only applies to extra work situations.

 The trial judge, while agreeing with that the increased costs claimed by Appellant were not barred by part (a) of paragraph 52 as the continuing delay was confirmed in writing, found that part (c) of the paragraph was ap-

plicable to the claims and that compliance with its provisions was, as a result of part (d), a condition precedent to any recovery. After studying the provisions of the controverted contract and in view of the settled law in Georgia that the construction and legal effect of a written contract is for determination by the court, Goodwin, Inc. v. City of Lafayette, 5 Cir., 1969, 418 F.2d 698, we cannot conclude that the court's holding on this part of Appellant's argument was clearly erroneous.

The second prong of Appellant's argument upon appeal, however, alleges that it did in fact give notice to Appellees sufficient to satisfy paragraph 52(c–1) by a letter dated May 1, 1967.[10]

The trial court rejected this latter contention holding that the letter failed in several respects to comply with the strict terms of part (c–1) of paragraph 52. Specifically, the trial court held that the letter was inadequate notice under the contract because (i) it was not sent to the Architect-Engineer (Argonaut, a division of GM) and the Purchasing Department of GM as expressly required by the contract, and (ii) the letter did not contain the amount of the claim and all details in connection therewith as required expressly by the contract.[11] Appellant retorts here that,

(c-2) Within seven (7) days after receipt by the Architect-Engineer and Purchasing Department of the Contractor's written notice of claim, the Owner, shall, in writing, acknowledge receipt of such notice (with copy concurrently directed to the Architect-Engineer). At the time of such acknowledgment, or within a reasonable time thereafter, the Purchasing Department shall certify or deny the validity of the Contractor's claim. The Contractor shall furnish all information requested by the Purchasing Department to assist it in making its decisions.

(d) It is a condition precedent to the consideration or prosecution of claims by the Contractor that the foregoing provisions be strictly observed in each instance, and if the Contractor fails to comply, the Contractor shall be deemed to have waived the claim. Neither the provisions of this Section nor the re-

ceipt of any claim by the Architect-Engineer and Purchasing Department shall constitute admission on the part of the Architect-Engineer or Owner that any such claim is valid.

10. See note 8, *supra*.

11. The trial judge, while conceding that Appellant probably could not at the time of the letter have known the costs due to delay, seemed to fault Appellant more for not making known to Appellees the amount of the claim until some four months after final completion of the project instead of when the grading and subgrading work at that time in progress was completed or when an official start date was given to Appellant as its letter stated (see note 10, *supra*). Also weighed heavily by the court below was the failure of the letter to mention costs due to inefficiencies.

since its contract with General Motors (GM) envisioned from the beginning that the contract would be assigned from GM to the general contractor for the project (Whiting-Turner)[12] and GM's contract with the general contractor made such assignment mandatory,[13] it was not thus unreasonable for Appellant to have understood that any letters regarding delays should be sent to Whiting-Turner. Furthermore, it is argued that, considering the ostensible, if not yet formalized,[14] relationships between GM, Appellant and Whiting-Turner, Appellant's letter of May 1, 1967 to Whiting-Turner should have served as notice to GM. Appellant asserts as supportive of this proposition the agenda transacted at the first project progress meeting held on May 1, 1967.[15] It is argued that

12. See note 5, *supra*.

13. See note 6, *supra*.

14. The actual assignment by GM to Whiting-Turner of the GM-Ernst contract was not made until June 5, 1967.

15. The announced purpose of this meeting as recorded in the minutes was "discussing job procedures with assigned, subcontractors and for establishing date Process Building site could be turned over to General Contractor."

The significance of this meeting to Appellant's arguments on appeal is two-fold. First, the minutes of the meeting contained this entry:

\* \* \* \* \*

Black Grading Co. Advised that the site for the Process Facility Building would not be ready before June 12, 1967. Whiting-Turner stated that work on the building would not proceed in this area until all of the site is in proper condition for engineering and layout work.

\* \* \* \* \*

Appellant points out that this disclosure was its first formal notification that it would not be able to "start work immediately and proceed with the utmost dispatch and diligence" as its contract with GM provided. It was immediately following this notification that Appellant sent its letter to Whiting-Turner putting them on notice that it could not be responsible for additional costs incurred as a result of the delay (see note 7, *supra*).

Appellant further submits that the agenda transacted at the meeting rendered inescapably reasonable its conclusion that Whiting-Turner was the proper party for such notification in accordance with its contract. In support of this assertion Appellant relies on the fact that it was instructed at the meeting to deal directly with Whiting-Turner on several matters. Entries in the minutes of the May 1 meeting reflect these instructions:

\* \* \* \* \*

2. Subcontractors will arrange with Whiting-Turner superintendent the location for all office and tool trailers. Subcontractor's office trailer must also have telephone.

3. 110 Volt temporary electrical service will be provided for subcontractors hand tools, source of supply to be located by Whiting-Turner superintendent.

4. Subcontractors advised to go through Whiting-Turner superintendent with all questions and clarifications in lieu of going directly to Resident Engineer. Each field superintendent will also be advised of this procedure.

5. Certificates of Insurance (3 copies) shall be mailed to Whiting-Turner's office as soon as possible.

6. Subcontractor shall be responsible for cleaning up daily and removing from the jobsite all trash and debris resulting from his operations. If he fails to fulfill this obligation, the General Contractor will take necessary measures to accomplish this clean up and will backcharge the Subcontractor accordingly.

7. Subcontractors will furnish badges to their personnel working within fenced plant area and they much check in each day with proper security guards. Only authorized personnel will be allowed within plant. Cold drink machines inside plant are off limits to construction personnel, however, cafeteria in front of plant will be available.

8. Breakdown of subcontractor's lump sum price for billing purposes shall be in Whiting-Turner's office by Thursday, May 4. Each month's percentage of work in place must first be verified in Whiting-Turner's office before invoices are prepared. Invoices must be in Whiting-Turner's office by the 27th of each month. Waiver of lien forms must be executed and in Chevrolets accounting office before the next month's invoice from Whiting-Turner becomes payable.

\* \* \* \* \*

Appellant asserts that both common knowledge and the "usage and trade" of the construction industry dictate that when a subcontractor works under a general contractor the "sub" deals solely on all matters with the general contractor in-

paragraph 25 of its contract [16] made mandatory Appellant's attendance at these progress meetings and full compliance with the instructions promulgated therein.

In response to the lower court's holding that Appellant did not state in its letter the "amount of the claim and all details in connection therewith," it is submitted on appeal that such a detailing and allocating of the additional costs involved here would have been virtually impossible at that time. Appellant contends that it was impracticable for it to arrive at a dollar measurement with any degree of accuracy until the project was completed. It is alleged that the original delay complained of in Appellant's May 1 letter was of a continuing nature, with further delays and resultant inefficiencies emanating therefrom,[17] necessitating that notice only be given once to adequately apprise Appellee that it had a grievance.

 A careful review of the record [18] has convinced us that threshold dismissal of Appellant's claims as a matter of law on grounds that it failed to strictly comply with the notice provisions of the contract was unwarranted. Here, Appellant's contention that the instructions given at the first progress meeting acted to modify the contractual reporting procedures and responsibilities is certainly made more believable by the common knowledge among all involved that assignment of the "subs" contract

stead of the owner. It is urged that the instructions recorded at the progress meeting clearly suggested, if not compelled, the existence of such a relationship here and that the announced purpose of the meeting serves to strengthen this conclusion.

Appellant points out that the fifth entry in the minutes listed above, requiring the subcontractors to submit certificates of Insurance to Whiting-Turner, altered paragraph 13 of its contract with GM which stated "Contractor (Ernst) shall submit to the Owner (GM) certificate of insurance * * *". Appellant argues that the eighth entry in the minutes is likewise inconsistent with paragraph 3 of its contract which provides "After the contract is awarded and previous to the first payment under the contract, the contractor (Ernst) shall submit to the Architect-Engineer and Owner a schedule of prices or breakdown of the estimated cost * * *" and paragraph 8 of its contract which provided "contractor's applications to the Architect-Engineer for payment * * *". Ernst maintains that it complied fully with these changes in procedure without ever hearing a protest from GM. It is strenuously argued that the instructions given Ernst at the progress meeting should not be construed to have altered the contractual relationship of the parties on some matters and not on others.

Finally, Appellant submits that entry number seventeen in the progress meeting minutes which stated

> As of this date Whiting-Turner has not received any contract documents (plans, specifications, purchase orders) for the assigned subcontractors. It will be

necessary for these documents to be delivered before work can progress and bulletin changes can be quoted.

\* \* \* \* \*

reflected only a delay in paperwork between the Appellees and should not permit them to escape liability to Appellant.

16. Paragraph 25 of Appellant's contract entitled "Contractor's Meetings" provided:

> As directed by the Architect-Engineer, there is to be held at his field office a meeting of the representatives of the various trades engaged about the building, for furthering the progress of the work and giving of instructions by the Architect-Engineer. Where the Contractor's Representatives fail in attendance or in executing the instructions given them, they shall on request of the Owner be dismissed from the work and other representatives must be immediately substituted.

17. Appellant contends that the extra costs incurred as a result of inefficient performance during the winter season, some six to seven months after the initial delay, are directly attributable to the late start. Had the project been able to get underway as originally planned, Appellant contends that the omissions of Appellees such as failure to timely enclose the building, failure to provide roof heaters, and failure to provide temporary protection and heat would not have been so significant.

18. Our review, not limited to the appendices prepared by the parties, has encompassed the original record including all depositions and exhibits.

to the general contractor was predetermined. It is settled that the question of whether such modification actually occurred may not be summarily decided but must be preserved for the trier of fact. Farnsworth & Co., Inc. v. Tri-State Construction Co., 5 Cir., 1959, 271 F.2d 728.

The lower court apparently considered it significant that Appellant's letter of May 1 referred only to damages for delay itself and not costs due to inefficiencies. The court concluded that the letter could not thus be considered to cover increased costs due to inefficiencies. We disagree. As already discussed, the vast majority of the inefficiencies complained of were either closely connected to or emanated from the initial delay complained of in the letter. The purpose of a notice provision in a contract is to alert the other party that the claimant has a grievance against it. We are of the opinion that notice that one cannot be responsible for extra costs inherent in a delay encompasses those inefficiencies caused by severe winter working conditions which would not have been incurred but for the delay.

The district court, while conceding that Appellant, at the time of its letter, probably could not have known the costs due to delay, held against Appellant in any event, because Appellant did not make known the amount of the claim when an official start date was given [19] or as the increased costs were actually incurred. Our reading of the record has not convinced us that an official start date was ever in fact given to Ernst.[20] Furthermore, since the initial delay appears to have been a continuing one, thereby causing certain stages of the work to be done under severe weather conditions with an absence of corresponding support as contractually required.[21] notice given "as the increased costs were actually incurred" would have practically required Appellant to give daily notice. Bearing in mind the generally accepted purpose of the notice provision, which is to alert the other party of a grievance against it, we think the giving of such daily notice is more of a burden than a contract or the law should impose.

The relationship of an electrical subcontractor with a general contractor on an overall project is in the nature of symbiosis. The performance of one is dependent on prior performance by the other, and so on until completion, with their combined efforts producing, in this case, a building.[22] The general contrac-

---

19. Appellant's letter of May 1 clearly indicated that a proposal for additional compensation would be forthcoming after the "official start date."

20. We are convinced that Ernst's acceptance of the contract envisioned their beginning work "without delay" as its contract provided. In his deposition Mr. Bystry, the division manager for Whiting-Turner testified that he didn't believe a new (subsequent to the initial delay) start date, beneficial occupancy, or completion date was ever given by GM.

The importance of an "official start date" where, as here, there has been an initial delay, is to inform all contractors whether the owner intends to hold them to the original contract completion date which would inherently involve extra costs due to accelerated performance (extra men and overtime).

21. The contract between GM and Ernst provided in its special conditions section under a paragraph entitled "Temporary Space Heating Requirements":

After the building construction has progressed far enough, the areas will be enclosed by the General Contractor, by use of temporary walls, partitions and suitable coverings to retain heat within the work areas. Within the various rooms and areas the ambient temperature shall be maintained at no less than 50°F. and higher where and as required for each particular type of trade work.

22. Of the seven items of work required to be complete for beneficial occupancy, three were of great significance to the Appellant—the floor slab and the enclosure of the building (roofing and siding). The completion of these three items of work

tor, however, as the assignee of the "sub's" contract, has the ultimate responsibility for completion of the project.[23] Here, though the subcontractor's attempt to give notice of its grievance was limited to its letter of May 1, 1967, there is ample evidence in the record that GM was notified of the hardships being experienced by its contractors due to the delays and the consequent severe winter working conditions.[24]

Our decision here should in no way be construed as relieving the parties to a contract of strict compliance with notice provisions and the like. To the contrary, it results from our conclusion that, under the particular facts of this case, Appellant complied with the notice provision contained in paragraph 52 of its contract to the extent reasonable.

When a contract calls for such a specification of damages as the one here, obviously it cannot exact of a claimant the impossible, and no Georgia court would so require. The question we have answered here is—need Appellant, at the time of its May 1 letter, have made their notice any more specific than it did? Our answer to that is one well supported in general contract law—if it could have, it should have. We think the record supports the conclusion that here it did all it could have done.

■ Though never reached by the trial court, defendants below asserted four alternative grounds for summary judgment (see note 4, *supra*). One of them, we think, merits treatment here. On October 29, 1968, at the behest of Appellant,[25] a meeting was held between

was important to Appellant because a large part of its work was overhead electrical work. The floor slab was critical since Appellant, when bidding the job, had planned to use rolling scaffolding. The roofing and siding was necessary to prevent rain, sleet, snow, and cold weather from interfering with the work.

The revised bar charts and job schedules distributed periodically to Appellant reflected repeated postponements of the completion of these three items of work.

23. It is significant here that Mr. Feren, GM's Field Representative, testified that the delays on the project were due to no fault of Appellant.

24. Whiting-Turner notified GM by letter dated January 17, 1968 that, due to the initial delay, they were experiencing great hardship involving additional time and money resulting from severe winter weather working conditions. There can be no doubt that GM knew that these hardships must have equally hampered the activities of the "subs" working under Whiting-Turner.

As it turned out, Whiting-Turner never submitted a claim for additional compensation. Mr. Bystry, Division Manager for Whiting-Turner, testified that "the main purpose (of the letter) was for us to get on record * * * with the owner in accordance with the specifications for any delays or claims that we might come up with a later day."

That GM was acutely aware of the continuing problems caused by the initial delay is made manifestly clear evidenced by a letter from GM's field representative, Mr. Greco, to GM's Senior Project Engineer, Mr. Feren, written upon receipt of Whiting-Turner's letter of January 17, 1968. In that letter Mr. Greco speculated that the efficiency of the men working on the project in the extremely cold weather dropped to 40% of that which was normal.

The "progress meetings" and periodic "bar charts," a substitute for the CPM requirement which had never become reality, had as their purpose the assurance of timely completion of the various phases of the project. The minutes of the meetings and the revised job schedules which were submitted continually from Whiting-Turner and General Motors to Appellant clearly confirmed their knowledge of the delays. There is ample evidence in the record which indicates that there was no "surprise" upon receipt of Appellant's claim.

25. A letter dated September 10, 1968 from Mr. E. P. Johnson, Jr., Manager of Ernst's Atlanta Office to General Motors Corporation stated in pertinent parts:

\* \* \* \* \*

"We bring to your attention that there are many outstanding directives which have not been covered by Change Orders.

representatives of GM, Whiting-Turner and Appellant to settle "outstanding directives which had not been covered by change orders." At this meeting Appellant accepted payment of more than $20,000 in settlement of these "outstanding directives." Appellees argue that all claims, including the claims which are the subject of this suit, are barred by the settlement reached at the October 29 meeting. We disagree.

Though we would agree that Appellant's letter evidences a poor choice of language,[26] we do not think that their intention there was to settle the claims at bar here. To so hold would not only be to read that particular phrase out of context with the rest of the letter, but, in view of the nature of the other claims settled at the October 29 meeting, such a holding would be illogical. The record supports the conclusion that Appellant requested this meeting to settle various directives from GM to perform extra work incurred during the course of the project, but for which no price had been agreed upon between the parties. The only thing which remained on these claims of record was for the parties to meet and negotiate the prices.[27]

Appellant here has demonstrated to our satisfaction that genuine triable issues of fact are in existence. Where such a showing is made, summary judgment may not be substituted for trial. Bruce Construction Corp. v. United States, *supra*.

Vacated and remanded.

---

 \* \* \* \* \*
We suggest that a meeting be set up as soon as possible in order to thoroughly discuss and settle all outstanding directives, claims, etc."

26. See note 25, *supra* where it specifies the purpose of a meeting to "settle *all* outstanding \* \* \*, *claims*, etc." (emphasis ours).

27. We find the remainder of Appellee's alternative asserted grounds for summary judgment without merit (see note 4, *supra*).

