**Rudolph SWEET et al., Plaintiffs,**

**Eddie Rhyne et al.,
Plaintiffs-Appellants,**

**v.**

**Robert E. CHILDS, etc., et al., etc.,
Defendants-Appellees.**

**No. 73–3842.**

United States Court of Appeals,
Fifth Circuit.

Jan. 31, 1975.

---

Kent Spriggs, Tallahassee, Fla., Nathaniel R. Jones, James I. Meyerson, New York City, for plaintiffs-appellants.

William H. Jeffress, Jr., R. Stephen Browning, Washington, D. C., for amicus curiae.

Joseph A. Sheffield, Marianna, Fla., for defendants-appellees.

Charles E. Miner, Jr., Gen. Counsel of Fla. Bd. of Ed., Gene T. Sellers, Counsel, Tallahassee, Fla., for Fla. State Bd. of Ed.

Before BROWN, Chief Judge, and BELL and MORGAN, Circuit Judges.

BELL, Circuit Judge:

Appellants brought this civil rights action[1] individually and on behalf of other black students attending public schools in Jackson County, Florida. Joined as defendants were the Principal of Marianna High School, the Superintendent of Schools in Jackson County, and the Jackson County School Board [hereinafter collectively referred to as "county officials"],[2] as well as various state officials who comprise the Florida State Board of Education [hereinafter referred to as "state officials"]. Appellants alleged that the county officials had implemented certain disciplinary policies and procedures which resulted in a pattern and practice of racial discrimination throughout the Jackson County public school system. The state officials were alleged to have sanctioned, through inaction, the claimed discriminatory policies and procedures. Claims were also enumerated as to violations of the Thirteenth Amendment, due process, and freedoms of speech and assembly.

Declaratory and injunctive relief was sought including, inter alia, specific relief in the form of directing the state officials to submit a plan to effect the discontinuation of the discriminatory disciplining, and directing the county officials to submit proposed rules governing student misconduct and punishment. They also asked the court to direct the county officials to expunge the records of all black students adversely affected by the alleged unconstitutional practices.

After first denying appellants' motion for preliminary injunction, and then denying motions to dismiss by both state and county officials, the district court granted an uncontested motion for summary judgment made by the state officials. Upon trial without jury on the merits of the allegations remaining against the county officials, the court dismissed appellants' claims, and denied appellants' motion for a rehearing on the summary judgment.[3] This appeal is

---

1. Appellants brought the action under 42 U.S. C.A. §§ 1981, 1983, and 1985(3), the Thirteenth and Fourteenth Amendments to the United States Constitution, and Fla.Stat. §§ 230.23 and 230.33. Jurisdiction was noted by the district court under 28 U.S.C.A. § 1343(3).

2. The sheriff and prosecutor of Jackson County, and the Chief of Police of the City of Marianna, were also made defendants, but appellants subsequently abandoned their claims against them.

3. Rhyne v. Childs, N.D.Fla., 1973, 359 F.Supp. 1085.

from the final judgment entered pursuant to this order.

Appellants contend that the district court erred in sustaining the state officials' motion for summary judgment because genuine issues of material fact existed as to their case against the state officials. They dispute, furthermore, the legal conclusions reached by the lower court on the merits of the summary judgment motion. With respect to their case against the county officials, appellants argue that the district court erred in failing to declare the actions of the county officials to have been violative of their equal protection, due process, and free speech rights, and in failing to enjoin further disciplinary action as racially discriminatory. We affirm.

## I.

The disciplinary actions which are at the center of this controversy were taken by Jackson County school officials during the two-year period following court-ordered desegregation of the public school system in 1970. Racial confrontations which took place on January 3 and 6, 1972, were catalysts for the disciplinary actions taken against the appellants. On January 3, interracial fighting broke out at Marianna High School. Although no student was disciplined solely for his participation in the fight, four students were expelled who had participated in the fight and committed other specific acts of misconduct.[4] Appellant Small disobeyed the order of Principal Lowell Centers to cease fighting, and attempted to provoke further disruption. Appellant Long, when commanded by an assistant principal to stop fighting, threatened the administrator with a stool. Later that day, appellants Nance and Heatrice, together with Small, confronted a teacher, verbally abused him,

and physically threatened him. The threat on the part of Nance was in the form of holding a piece of broken concrete in his hand as if to strike the teacher.

On January 10, the parents of these four students were notified that the Jackson County Superintendent of Schools was recommending that the school board expel their children from school. Hearings were held on January 20, resulting in the expulsion of Small, Long, Nance and Heatrice.

Three days after the melee of January 3, black students staged a sitdown in the hallways of Marianna High. Principal Centers persuaded the students to disperse, and held a conference with a group of them so that they might choose whether they wanted to return to classes or leave the school grounds and take a zero for the day. The students chose to leave. As they departed, however, they violated their arrangement with the principal by encouraging other black students still in class to leave with them. This caused further disruption throughout the school. Later, the principal announced over local radio that all who had left school that day would be suspended for ten days. Included in this group of 124 students were named appellants Pittman, Sweet, and Smith.

The parents of the students who had been suspended were notified and afforded conferences with school officials beginning on January 10. Within three days, conferences had been held with the parents, and all suspensions were lifted. All students were reinstated before the end of the original ten day period of suspension.

Appellant Pittman, although reinstated as a part of the suspended group, was expelled on January 20 along with the four appellants discussed above.[5] Cited

4. In seeking to dispose of the claims of each named appellant, we begin with appellants Fletcher Small, Victor Long, Melvin Nance, and Benjamin Heatrice. As will be seen, the other named appellants are John Pittman, Rudolph Sweet, Gloria Smith, Murial Rhyne, Eddie Rhyne and Billy Earl Harrison. There will be no discussion of Harrison's claim, which has apparently been abandoned.

5. Originally, the county board's expulsion of Small, Nance, Long, Heatrice, and Pittman was permanent. In its Opinion-Order of March 22, 1972, however, the district court ordered the county board to limit the period of the expulsions to the 1971–72 school year.

in the expulsion resolution of the school board were various acts of misconduct by Pittman between October 1971 and January 1972, including his participation in the January 6 disruptions and his non-cooperation with school officials during his post-suspension conference.[6]

## II.

On February 12, 1973, the state officials moved for a summary judgment based upon the pleadings, interrogatories, and answers to interrogatories that had been filed. They alleged that there was no genuine issue of material fact and that they were entitled to judgment as a matter of law. Appellants failed to respond to the motion. More than a month later, the district court granted summary judgment. Appellants moved for rehearing on April 24, over two months after the original motion had been filed. They alleged "facts in the nature of evidence" which they felt the court should have considered in ruling on the summary judgment motion. No affidavit was offered. The court denied the motion for rehearing.

Rule 56(b), F.R.Civ.P., permits a defendant to move at any time, with or without supporting affidavits, for a summary judgment. Once a proper motion is filed, though, Rule 56(e), F.R.Civ.P. provides that

an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

It was the intent of the drafters that the above portion of Rule 56 would discourage a party from merely standing on his pleadings in the face of a summary judgment motion. See Notes of Advisory Comm. on 1963 Amendment, 28 U.S. C.A. at 416.

The Supreme Court in Adickes v. S. H. Kress & Co., 1970, 398 U.S. 144, 159–161, 90 S.Ct. 1598, 26 L.Ed.2d 142, 155–156 has agreed with the Rules Advisory Committee as to the thrust of Rule 56(e). The district court in Adickes had granted a summary judgment and, to the petitioner's argument for reversal on appeal, the respondent contended that the petitioner had failed properly to contest the original motion. The Court stated that it is the movant's burden "to show initially the absence of a genuine issue concerning any material fact." Id. The Court found that the respondent in Adickes had failed to carry this burden. Had it been successful, however, the Court, in dicta, stated that "Rule 56(e) would then have required petitioner to have done more than simply rely on the contrary allegation in her complaint." Id. For a similar analysis, see First National Bank v. Cities Service Co., 1968, 391 U.S. 253, 289–290, 88 S.Ct. 1575, 20 L.Ed.2d 569, 592–593.

The Fifth Circuit has consistently followed the Adickes analysis of Rule 56(e), that once a movant carries his burden of showing no genuine issue of material fact, it is the non-movant's burden to rebut this showing with his own "affidavit or otherwise." If he fails to do so, the summary judgment, if otherwise appropriate, is affirmed. See, e. g., E. C. Ernst, Inc. v. General Motors Corp., 5 Cir., 1973, 482 F.2d 1047, 1049; Garcia v. American Marine Corp., 5 Cir., 1970, 432 F.2d 6, 7–8; Lovable Co. v. Honeywell, Inc., 5 Cir., 1970, 431 F.2d 668, 670–671.

The state officials made an initial showing of the absence of disputed facts. Appellants failed to establish the contrary. Thus the summary judgment is due to be affirmed provided the second

---

**6.** It developed that named appellants Eddie and Murial Rhyne were suspended in Spring 1971 on an occasion unrelated to that in which the other named appellants were involved. The district court found that the two Rhynes were afforded adequate procedural safeguards and that the board's actions had adequate factual bases. These findings are not clearly erroneous. Their other association with the law suit rests on the claim of a pattern and practice of racial discrimination, to which we will address ourselves *infra*.

prerequisite, that the movant is "entitled to a judgment as a matter of law," is fulfilled. Rule 56(c), F.R.Civ.P. *See* Ranger Insurance Co. v. Algie, 5 Cir., 1973, 482 F.2d 861, 863; Dozier v. United States, 5 Cir., 1973, 473 F.2d 866, 868–869. We hold that the district court did not err in its determination that the state officials were entitled to a judgment as a matter of law.

■ In Florida, the State Board of Education and the county school boards are both constitutionally created. Fla. Const. art. IX, §§ 2, 4. Statutory law vests the State Board with overall policy-making authority, Fla.Stat. § 229.053 (Supp. 1974), while the local school boards are invested with authority to adopt rules and regulations for the "control, discipline, and suspension of pupils" and to "decide all cases recommended for dismissal." Fla.Stat. § 230.23(6)(c) (Supp.1974). As pointed out by the district court, finally, the Florida Supreme Court has viewed the area of student "conduct and discipline" as "vested primarily in the county boards." Satan Fraternity v. Board of Public Instruction of Dade County, 156 Fla. 222, 22 So.2d 892 (1945).

The most recent judicial statement on the relationship between the Florida State Board of Education and school disciplinary matters is found in Canney v. Board of Public Instruction of Alachua County, 222 So.2d 803 (Fla.Dist.Ct.App. 1969). There, a student was suspended by his public school principal, whose action was later affirmed by the county school board. The student appealed his case to the State Board of Education, and simultaneously applied for a writ of certiorari to the Florida District Court of Appeal. The court granted the defendant county school board's motion to dismiss pending administrative review by the State Board. The State Board refused review, however, claiming lack of jurisdiction. A second petition for certiorari was filed, and the District Court of Appeal then held that, because the proper avenue of review for a quasi-judicial order of a state agency is by

certiorari to the District Court of Appeal, and because the county school board had previously been held to be a state agency, the suspension decision was properly reviewable only by the District Court of Appeal. In passing, however, the court approved the State Board's "no jurisdiction" decision. *Cf.* Agner v. Smith, 167 So.2d 86 (Fla.Dist.Ct.App. 1964).

■ We conclude from these authorities that the design of the applicable Florida law is to leave disciplinary matters to local school authorities as distinguished from the State Board of Education. The case against the state officials rests on their alleged failure to act, but their claimed inaction was not proximately related to the alleged discriminatory disciplining in question. The district court therefore was correct in concluding that, as a matter of law, the state officials were entitled to summary judgment.

### III.

After granting the state officials' motion for summary judgment, the district court tried and dismissed appellants' claims against the county officials. To reiterate, these claims were that the county officials had participated in a pattern and practice of racial discrimination through their disciplinary policies and practices during the 1970–72 period, that appellants had not received procedural due process from the county officials in connection with their suspensions or expulsions, that the disciplinary actions taken had become "badges of slavery," and that these actions had violated appellants free speech and assembly rights.

■ On appeal, appellants again contend that the disciplinary actions which befell them in January 1972 were parts of a larger pattern of racial discrimination that pervaded the Jackson County school system. The gist of the argument is to make out a mathematical equal protection argument: more black students had been disciplined than whites, hence,

a violation of the equal protection clause. The answer to the argument is that it lacks a factual foundation. There was no showing of arbitrary suspensions or expulsions of black students nor of a failure to suspend or expel white students for similar conduct.

■ We further find no error in the court's disposition of the due process claims. Dixon v. Alabama State Board of Education, 5 Cir., 1961, 294 F.2d 150, is the leading Fifth Circuit case dealing with procedural due process in the context of student disciplinary proceedings. The basic requirements for notice and hearing prior to the expulsion of a student from a state-supported school are outlined in Dixon:

> The notice should contain a statement of the specific charges and grounds which, if proven, would justify expulsion. . . . The nature of the hearing should vary depending upon the circumstances of the particular case. 294 F.2d at 158.

These requirements have been extended to suspensions for a "substantial period of time," with ten days being classified as such a period. Black Students of North Fort Myers v. Williams, 5 Cir., 1972, 470 F.2d 957.

■ In the present case, the five appellants who were expelled received notice ten days before their expulsion hearings were to take place. They were notified of their right to be present. The specific charges and the names of the witnesses against them were included in each notice. Once the expulsion decisions were reached, resolutions were adopted giving the reasons for the actions taken. Finally, under the Canney case, cited supra, the expelled students were given the right to appeal the board's decision to the Florida District Court of Appeal. It is clear, therefore, that the five appellants who were expelled in January 1972 were not denied procedural due process.

■ We likewise find no lack of procedural due process as to the appellants who were suspended on January 6 after staging the sitdown and disrupting classes. They were suspended without prior notice or pre-suspension hearings shortly after they left school on Thursday the 6th. The following Monday, January 10, conferences were held with the students and their parents, and all students were reinstated during that week. No student was out of school for the duration of the ten day suspension. Under these circumstances, we find no violation of procedural due process. See Murray v. West Baton Rouge Parish School Board, 5 Cir., 1973, 472 F.2d 438, 443; Cf. Sullivan v. Houston Independent School District, 5 Cir., 1973, 475 F.2d 1071, 1077–1078; Black Students of North Fort Myers v. Williams, supra, 470 F.2d at 958.

Finally, we find no error in the district court's ruling against appellants with respect to their Thirteenth Amendment, free speech, and free assembly claims. These claims were without factual support. The disciplinary proceedings in question were based on cause.

Affirmed.

JOHN R. BROWN, Chief Judge (concurring in part and dissenting in part):

While I join fully in both the reasoning and the result of the Court's opinion with respect to the named plaintiffs: Small, Nance, Heatrice, Long and Pittman, I must dissent in a very limited way because of an issue that is not even discussed by the Court. I remain convinced that the ten-day suspensions of the approximately 120 remaining students for leaving Marianna High School on January 6, 1972 should be expunged from their school records because this punishment was meted out without notice to the students of the consequences of their actions.

While I am mindful of the potential confusion that arises when participants in volatile events must recall precise incidents long afterwards, the testimony of all witnesses consistently indicates that

Principal Centers did not limit his offer solely to the approximately 40 students participating in the auditorium meeting, nor did he ever suggest that the offer was contingent on their not soliciting other students to join in the walkout. His ultimatum to the students in attendance at the auditorium meeting was to go to class or go home and take a zero for the day. When subsequently the students began to spread the news of the impending march and the zero option through the school, Principal Centers then announced over the school intercom that the students were to go home— again without any indication that the offer was extended only to the auditorium group or that it was subject to a tacit pledge not to enlist others in the walkout. As students came up to him to say that they had a sister or brother in another class and were afraid to leave them at school, Principal Centers said that the siblings could go home but they too would get zeros. It was not until later that afternoon, after the downtown march and arrests, that Principal Centers announced over local radio that those who had left school were suspended for 10 days or until the administration could meet with their parents.

The mass suspensions that Principal Centers invoked that afternoon lasted technically only a few days but as a practical matter their effect continues up to the present day because the suspensions remain a part of each student's permanent school record. Such reports could obviously be a substantial reflection on their career options long after they have left school. These students are actually being punished for violating an order that was never given—a sanction that goes to the core of due process. It is unquestionable that these students are vested with a Fourteenth Amendment "liberty" interest by virtue of these records and their ramifications. Cf. Board of Regents v. Roth, 1972, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548; Perry v. Sindermann, 1972, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570, 578.